No. 77,804

STATE OF KANSAS, *Appellee/Cross-Appellant*, v. PETER REASON, *Appellant/Cross-Appellee.*

(951 P.2d 538)

Opinion filed December 12, 1997.

*Charles R. Reimer*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the briefs for appellant.

*Gail A. Jensen*, of Wichita, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

SIX, J.: The primary focus of this case is on Fourth Amendment issues arising from the search of defendant Peter Reason and of his car. We also review the prospective application of certain 1996 amendments to the Sentencing Guidelines Act.

Reason appeals the denial of his motion to suppress evidence that resulted in his felony convictions for possession of cocaine, K.S.A. 1994 Supp. 65-4160(a), a drug severity level 4 felony; possession of cocaine without a tax stamp affixed, K.S.A. 1994 Supp. 79-5208, a nondrug severity level 10 felony; possession of marijuana with intent to sell, K.S.A. 1994 Supp. 65-4163(a), a drug severity level 3 felony; and possession of marijuana without a tax

stamp affixed, K.S.A. 1994 Supp. 79-5208, a severity level 10 felony. Reason was tried before the district judge, the parties having stipulated to the testimonial evidence presented at the preliminary hearing and motion to suppress evidence hearing.

Although Reason's crimes were committed on June 14, 1995, he was sentenced under Senate Bill 585, which went into effect on July 1, 1996. L. 1996, ch. 258, § 11; see K.S.A. 1996 Supp. 21-4705. The State cross-appeals upon a question reserved, contending that the district court should not have applied the 1996 legislative changes to the Sentencing Guidelines Act retroactively.

Our jurisdiction is under K.S.A. 22-3602(a) (appeal by defendant from an adverse judgment) and K.S.A. 22-3602(b)(3) (appeal on a question reserved by the prosecution).

We affirm the district court's denial of defendant's motion to suppress evidence; we sustain the State's cross-appeal on the sentencing issue.

## FACTS

Officers Johnson and Falco were patrolling a park in Wichita when they saw a BMW with a 30-day New Mexico tag parked in the parking lot, with both doors open. Johnson became suspicious because no one appeared near the BMW. He thought the BMW might either have been abandoned or was being stripped. Johnson parked the patrol car behind the BMW. There was room for the BMW to leave by pulling forward and circling in the parking lot to the exit road. Both officers approached on foot, Johnson on the driver side and Falco on the passenger side. They observed two men sleeping, Reason in the driver's seat and Alfred Moya in the front passenger's seat. It was a hot day. Reason and Moya were sweating heavily. Johnson awoke Reason to find out why the car was there, if Reason was okay, or if he was intoxicated or unconscious. Reason was coming out of a sound sleep and requested a minute or so to think. Johnson waited a few minutes and then asked Reason for identification and if he was the owner. Reason got out of the BMW and identified himself. He said his wallet had been stolen, that he had no written identification with him, and that he owned the BMW.

Officer Falco asked Moya if Moya would mind stepping outside so that Falco could talk to him privately. Moya complied. Falco walked with Moya back to the rear of the BMW. Falco asked Moya for identification. Moya gave him a New Mexico driver's license. Falco gave the license to Johnson so that Johnson could run a wants and warrants check. Falco asked Moya why he and Reason were in the park. Moya said he was new to the area and Reason was showing him around.

Johnson ran a check on the vehicle identification number (VIN). The check revealed that the BMW was registered to Reason, with a Kansas tag. No outstanding warrants were shown on Reason or Moya.

Johnson asked Reason why the BMW had a 30-day New Mexico tag and a registered Kansas tag. Reason replied that the Kansas tag had been stolen and he had secured another tag in New Mexico. Reason advised that he was living in New Mexico. Johnson was satisfied with that answer. He told Reason that he was free to go, but shortly after that, in the same conversation, asked if Reason minded if Johnson searched the BMW. Moya remained outside with Falco. Johnson had Moya's driver's license. According to Johnson, in response to the BMW search inquiry, Reason said, "Sure," and offered to open the trunk. Reason also said, "Good luck." The consent was given at approximately 5:10 p.m. The officers had parked behind the BMW around 4:50 p.m.

Johnson found what he believed was a crack pipe in an ashtray in the console area. He informed Falco, took custody of Reason, and asked Falco to handcuff Moya. Johnson continued the search. He located a large baggie of marijuana under the back seat. The search of Reason revealed a cigarette box containing white powder, which tested as cocaine. Falco found two more bags of marijuana in the trunk. Moya did not receive his driver's license back from the police until sometime after his arrest.

After the preliminary hearing, Reason filed a motion to suppress the evidence discovered during the search. Reason and Officers Johnson and Falco testified. When asked why he and Moya were asleep in the car, Reason explained that he had just driven up from Albuquerque about 4 hours before. When asked why he slept in

the car when it was so hot out, Reason said he was trying to get a suntan. Reason said that Johnson ordered him to exit the BMW when the officer first approached. Reason gave Johnson his Kansas driver's license number and his address. Johnson initially testified that Reason remained in the BMW during the questioning and at the time he was told he was free to go. Reason did not get out of the BMW until he consented to the search. During cross-examination, Johnson agreed with his preliminary hearing testimony that Reason got out of the BMW when Johnson approached and began to ask questions. However, Johnson said that he never ordered Reason to exit the BMW. Reason denied he consented to the search and that he was ever asked for consent. Reason claimed that Johnson searched the BMW three times, without consent, and found nothing until the third search. Reason denied that Johnson ever told him he was free to leave. According to Reason, Johnson told him he could go back to the BMW after Johnson received the Kansas driver's license number and address. Reason claimed that once he reentered the BMW, Johnson ordered him out to search again. Reason denied saying "good luck" before the search.

The district court denied the motion to suppress. The district judge reasoned that

"the officers had every right to be there, ask the driver and the passengers some questions. . . . I think it would have been irresponsible for them to not have approached the car and not to have asked some questions given the fact that there was an out-of-state tag in the window, a number of different things. There was nothing unreasonable about that."

The district judge, believing the officers' testimony, decided that a valid consent to search had been given. Reason renewed the motion to suppress at trial. The motion was again denied.

Reason was sentenced on August 30, 1996. The crimes were committed on June 14, 1995. At the sentencing hearing, the State requested consecutive sentencing, for a controlling term of 35 months, with presumptive imprisonment under the sentencing guidelines in effect before the 1996 amendments. Reason's counsel argued that K.S.A. 1996 Supp. 21-4705 should apply, which provided for optional probation. The district judge agreed and sen-

tenced Reason under the 1996 amendments to a controlling term of 23 months, with probation for 36 months.

## DISCUSSION

### The Motion to Suppress

When we review a decision on the suppression of evidence, we normally give great deference to the factual findings of the district court. *State v. Vandiver*, 257 Kan. 53, 58, 891 P.2d 350 (1995). We said in *State v. Hopper*, 260 Kan. 66, 68-69, 917 P.2d 872 (1996): "The initial question remains whether the district court's findings are supported by substantial evidence. If so, the appellate court should not reweigh the evidence. However, the ultimate determination of the suppression of evidence is a legal question requiring independent appellate determination. [Citation omitted.]"

In *State v. Ninci*, 262 Kan. 21, 32, 936 P.2d 1364 (1997), we listed certain factors that indicate whether consent after a primary illegality is voluntary, purging the primary taint, or whether the consent is coerced exploitation of the primary illegality:

"Factors which indicate that the exploitation of the primary illegality was used to coerce a consent are (1) if the officers used deception to gain consent, and (2) if the defendant had no knowledge that he could refuse to consent. Factors which indicate that the consent was voluntary and purged the primary taint are (1) if the officers' behavior was not threatening or coercive, (2) if the defendant indicated intent to consent, (3) if the defendant has an education, (4) if the defendant is not under the influence of intoxicants. [Citation omitted.]"

Reason concedes his car was stopped at the time of the encounter and that the police were entitled to request identification and run a computer check on the car and driver. However, he argues that once a valid license and proof of the right to operate the vehicle is shown, the officer must allow the driver to continue without further delay, citing *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990), *cert. denied* 501 U.S. 1207 (1991). We agree with the Tenth Circuit's analysis in *Pena*. *Pena's* detention was held to be reasonable, and his consent to search his car was therefore valid. His conviction was affirmed.

Here we are not dealing with an illegal traffic stop. Reason was parked at the time of the police encounter. The question is whether

there was a seizure at the time the request to search was made. There is no taint to purge from the consent if there was no illegal detention. In *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir. 1997), it was held:

"An officer conducting a routine traffic stop may perform a computer check on the driver's license and the vehicle registration papers. [Citations omitted.] Once the officer has conducted such a check, and " 'the driver has produced a valid license and proof that he is entitled to operate the car, [the driver] must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.' " [Citation omitted.] The officer may only detain the driver and conduct further questioning if, during the traffic stop, 'the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity.' [Citations omitted.] Additionally, if the encounter between the officer and the driver ceases to be a detention, but becomes consensual, and the driver voluntarily consents to additional questioning, no further Fourth Amendment seizure or detention occurs."

See *State v. Schmitter*, 23 Kan. App. 2d 547, Syl. ¶ 5, 933 P.2d 762 (1997).

Was there a seizure here, and if so, an illegal detention? We said in *State v. Damm*, 246 Kan. 220, 224, 787 P.2d 1185 (1990):

"An individual is 'seized' when an officer restrains his freedom, even if the detention is brief and falls short of arrest. The Fourth and Fourteenth Amendments prohibit unreasonable seizures as well as searches. [Citations omitted.] The scope and duration of a seizure must be strictly tied to and justified by the circumstances which rendered its initiation proper."

"If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed." *Florida v. Royer*, 460 U.S. 491, 498, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983). The United States Supreme Court in *Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991), observed:

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' [citation omitted], the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. The Court made precisely this point in *Terry v. Ohio*, 392 U.S. 1, 19, n. 16[, 20 L. Ed. 2d 889, 88 S. Ct. 1868] (1968): 'Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the of-

ficer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' "

In *Bostick*, as part of drug interdiction efforts, law enforcement officers routinely approached individuals, either randomly or because of suspicious behavior, at bus stations and questioned them. Two officers boarded a bus at a Fort Lauderdale stopover and, without any articulable suspicion, asked Bostick, a passenger, if they could inspect his ticket and identification. The ticket and identification matched and were returned. The officers told Bostick they were narcotics officers and requested consent to search his luggage. Although disputed, the officers claimed Bostick consented after being told he had a right to refuse consent. Drugs were found. The Florida Supreme Court reasoned that the encounter amounted to an impermissible seizure, adopting a per se rule against such encounters on buses, although the encounters would be permissible in most other public places. *Bostick v. State*, 554 So. 2d 1153, 1157 (Fla. 1989). The United States Supreme Court reversed and remanded the case for a determination under the correct legal standard of whether a seizure had taken place.

Bostick argued that the bus encounter was a seizure because he was not free to leave. He would have been stranded if he left the bus. The Court responded:

"Bostick's freedom of movement was restricted by a factor independent of police conduct—*i.e.*, by his being a passenger on a bus. Accordingly, the 'free to leave' analysis on which Bostick relies is inapplicable. In such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." 501 U.S. at 436.

"We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." 501 U.S. at 439.

Here the State argues that there was no seizure. Alternatively, the State contends that if there was a seizure, Reason's consent purged any otherwise illegal detention. The State acknowledges that the length of time between Johnson telling Reason he was free to go and the officer's request for consent to search was short. The

State points out that the officers' conduct was not flagrant. The officers did not thwart any attempt by Reason or Moya to leave or make any untoward demonstration of authority, show weapons, or engage in other coercive behavior.

Reason may have invited the encounter with police. An expensive automobile was parked in a public park parking lot (an area that would be regularly patrolled by the police) on a hot afternoon. Both doors were open and the two individuals inside were either asleep or possibly unconscious. This situation would naturally draw the police officers' attention.

We characterize Reason's initial contact with the police as a voluntary encounter. See *Ninci*, 262 Kan. at 30 ("'There are three types of police-citizen encounters: arrests, investigatory stops, and voluntary encounters. Voluntary encounters are not considered seizures and are not covered by the Fourth Amendment.' [*State v. Crowder*, 20 Kan. App. 2d 117, 119, 887 P.2d 698 [1994].]"). Although there was no articulable suspicion that Reason and Moya were committing crimes, the officers' approach of Reason's vehicle and questioning of Reason and Moya fit the voluntary encounter situation.

However, this encounter involved more than the police asking questions and requesting identification. Johnson not only requested identification and vehicle registration from Reason, but also had warrants and VIN checks done after Reason was unable to provide any identification or vehicle registration. With 20 minutes having expired between the initial contact and Johnson's request for consent to search, this voluntary encounter began to resemble an investigatory detention. "The officer must have reasonable suspicion of illegal activity to justify even a temporary detention," *Pena*, 920 F.2d at 1514. However, the police "need not close their eyes to suspicious circumstances," 920 F.2d at 1514.

Reason's claim of vehicle ownership without presenting any vehicle registration or personal identification would provide reasonable suspicion to Johnson sufficient to justify a further investigation to verify Reason's ownership claim. See *Pena*, 920 F.2d at 1514 (Following a traffic stop for speeding, defendant's failure to provide any vehicle registration provided part of the circumstances justi-

fying further investigation to determine if the vehicle was stolen.) Even if we view this encounter as an investigatory detention, its scope and duration were proper.

Any investigatory detention ended when Johnson told Reason he was free to go, and the encounter again became consensual. Reason appeared to voluntarily respond to Johnson's questions. Reason made no effort to end the encounter at any time, even after Reason was told he was free to go.

"[A]fter an officer issues the citation and returns any materials provided, the driver is illegally detained only if the driver has objectively reasonable cause to believe that he or she is not free to leave." *United States v. Shareef*, 100 F.3d 1491, 1501 (10th Cir. 1996).

## The Consent to Search

Was Reason's consent to search voluntary?

"The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circumstances, [citation omitted].'" *Ohio v. Robinette*, 519 U.S. 33, 136 L. Ed. 2d 347, 355, 117 S. Ct. 417 (1996). In *Robinette*, after stopping a motorist for speeding, the officer checked the driver's license and registration. He asked the driver to step out of the car, issued a verbal warning to the driver, and returned the license. The officer then inquired if the driver was carrying any illegal contraband. After the driver answered "no," the officer asked if he could search the vehicle, and the driver consented. A small amount of marijuana and a controlled substance were found. The driver was arrested. The United States Supreme Court reversed Ohio's per se rule that any attempt at consensual interrogation following a traffic stop must be preceded by telling the driver that he or she was free to go. Following a lawful traffic stop an officer is not required to say to the person that he or she is "free to go" as a prerequisite to a voluntary consent to search.

Reason relies on *Royer*, 460 U.S. 491, which involved what began as a consensual inquiry and became an unnecessarily intrusive investigatory detention. Royer, who fit the "drug courier profile," was questioned by two narcotics detectives at an airport. They re-

quested his airline ticket and driver's license, which he gave them. The airline ticket and driver's license had different names. Royer explained that someone else had reserved the ticket for him under the different name. The detectives told Royer they had reason to suspect he was transporting narcotics. While still possessing his driver's license and airline ticket, the detectives asked Royer to accompany them to a separate room. They also retrieved his luggage from the airline and asked if he would consent to a search. Royer was never told he was free to go. He produced a key and unlocked one suitcase, which contained drugs. The second suitcase was locked with a combination lock for which Royer claimed not to know the combination. When asked if he objected to the second suitcase being opened, Royer responded that he did not, and it was pried open, revealing more drugs. Royer was arrested. The United States Supreme Court held that Royer was illegally detained when he consented to the search. Thus, the consent was tainted. We find *Royer* distinguishable on the facts. Reason was told he was free to go before Johnson requested consent to search. The "free to go" signal is a factor in determining whether Reason objectively felt under police coercion at the time of his consent. Even if Johnson had failed to tell Reason he was free to go before requesting consent to the search, that may not necessarily have invalidated the consent. See *Robinette*, 519 U.S. at 39-40 ("[It would] be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary."); see also *Anderson*, 114 F.3d 1059 (While the trooper did not specifically tell defendant that he was free to leave, that is not required for an encounter to be consensual.).

## Reason's Contentions

Reason contends that because Officer Johnson had not returned Moya's driver's license at the time Johnson claims to have told Reason that he was free to go, Reason and Moya were not free to leave. Reason had no driver's license and could not have legally driven the BMW away (see K.S.A. 1994 Supp. 8-235). Also, he would have had to abandon Moya. According to Reason, the encounter was therefore nonconsensual absent the return of Moya's

license; any further questioning by police would have had to have been supported by probable cause that a crime had been committed. Reason claims that Johnson had no suspicions of criminal activity when he told Reason he was free to go; thus, Johnson's request for consent to search continued the investigative detention, making it illegal. Reason argues that any purported consent to the search was tainted by the illegal detention and therefore is invalid. Reason also asserts that there was insufficient discontinuity between the illegal seizure and the request for consent to search, so the taint was not purged. The request to search was practically simultaneous with the illegal seizure. See *United States v. Gregory*, 79 F.3d 973, 979-80 (10th Cir. 1996), where the court held:

"Even though Officer Barney returned defendant's license [following an illegal traffic stop], the return of the license was in close temporal proximity, if not simultaneous with, Officer Barney's inquiry whether he could look inside the defendant's truck and his directive that the defendant get out of the truck. . . . We have repeatedly held that consent is not voluntary when in such close temporal proximity to an illegal stop."

## The State's Contentions

The State argues that if Reason felt restricted from leaving, it was not because of police conduct but because of independent circumstances. Reason did not have a valid driver's license with him, not because the police still had it, but because it had been stolen earlier. If he would have had a driver's license, he could have simply driven off and left Moya to finish his interview with Officer Falco. Even without a driver's license, Reason could have ended the discussion with Officer Johnson and walked away from the area. The fact that the police had Moya's license and were questioning him would not have prevented Reason from ending contact with Officer Johnson. Reason's desire to stay near his BMW and Moya after Officer Johnson told him he was free to go was independent of police conduct. We agree with the State's contentions.

There were no circumstances showing that Reason was coerced by police to consent to the search of his vehicle. Although two police officers were present, only Officer Johnson dealt with Reason. There was no showing that Officer Johnson used forceful lan-

guage, brandished a weapon, or otherwise coerced Reason at the time of the consent. We conclude the consent to search was voluntary.

## The 1996 Legislative Amendments to the Sentencing Guidelines Act

We now turn to the State's cross-appeal on a question reserved. The district court, over objection from the State, applied the 1996 amendments to the Sentencing Guidelines Act retroactively. For continuity we repeat, the crimes were committed on June 14, 1995; Reason was sentenced on August 30, 1996. K.S.A. 21-4705 was amended in 1996, effective July 1, 1996. Reason's criminal history category was G. Under the pre-July 1, 1996, version of 21-4705(a), for a drug severity level 3 crime, the grid showed a presumptive imprisonment sentencing range of 20 to 23 months. Under the July 1, 1996, version, for the same severity level crime and criminal history category, the grid showed a "border box" sentencing range of 20 to 23 months. For crimes in the border boxes, the district court may impose an optional nonimprisonment sentence upon making certain findings on the record. K.S.A. 1996 Supp. 21-4705(d). Reason's sentence would have been presumptive imprisonment under the pre-July 1, 1996, version of 21-4705 but presumptive imprisonment with optional nonimprisonment under the July 1, 1996, version.

*State v. Ford*, 262 Kan. 206, 936 P.2d 255 (1997), is controlling. Ford was convicted of conspiracy to deliver marijuana, a drug severity level 3 offense, and was sentenced to 18 months' imprisonment in March 1996 under the sentencing guidelines then in effect. Ford appealed her sentence, arguing that the July 1, 1996, grid should have been applied retroactively to her sentence. We decided that K.S.A. 21-4705 was a substantive statute defining the length or type of criminal punishment. We apply a fundamental rule of statutory construction stated in *State v. Sutherland*, 248 Kan. 96, Syl. ¶ 4, 804 P.2d 970 (1991): "[A] statute operates prospectively unless its language clearly indicates that the legislature intended it to operate retroactively." See *Ford*, 262 Kan. at 208. In considering the K.S.A. 1996 Supp. 21-4705(a) introductory lan-

guage, in *Ford* we observed that the language was not amended by L. 1996, ch. 258, § 11 and had remained unchanged since the enactment of the sentencing guidelines in 1993. 262 Kan. at 209.

Ford was sentenced before July 1, 1996. Reason was sentenced on August 30, 1996. Thus, the 1996 amendments were in effect at the time of Reason's sentencing. Reason contends *Ford* is distinguishable because Reason's sentencing took place after the statutory amendments took effect. However, our determination in *Ford* that the 1996 amendment to 21-4705 is a substantive amendment dictates the result here. In applying 21-4705, the critical date is the date of the crime, not the sentencing date, absent express legislative intent to the contrary.

Reason's sentence under the 1996 amendments does not conform to the statutory provisions in effect at the time the subject crimes were committed. We have said that when a sentence does not conform to the statutory provisions, the proper remedy is to remand to the district court for correction of the illegal sentence. See *State v. Shaw*, 259 Kan. 3, 12, 910 P.2d 809 (1996).

We have general statutory jurisdiction to correct a judgment, K.S.A. 60-2101(b), and specific statutory jurisdiction to correct an illegal sentence at any time, K.S.A. 22-3504. See *State v. Scherzer*, 254 Kan. 926, Syl. ¶ 1, 869 P.2d 729 (1994).

Although remands are infrequent in appeals on questions reserved under K.S.A. 22-3602(b)(3), we have remanded to correct an illegal sentence, or to correct other district court action concerning sentencing, when the matter is not moot. See *State v. Miller*, 260 Kan. 892, 926 P.2d 652 (1996); *State v. Harpool*, 246 Kan. 226, 229, 788 P.2d 281 (1990). Reason does not appear to have completed his sentence.

We affirm (1) the district court's denial of Reason's motion to suppress and (2) Reason's convictions. We sustain the State's appeal on a question reserved and remand for resentencing under K.S.A. 21-4705.