(252 P.3d 627)
No. 102,681

STATE OF KANSAS, *Appellee*, v. JOSEPH C. HOGAN, *Appellant*.

Opinion filed April 15, 2011.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*David Lowden*, chief appellate district attorney, *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, for appellee.

Before GREENE, C.J., BUSER and ATCHESON, JJ.

GREENE, C.J.: Joseph C. Hogan appeals his convictions for possession of methamphetamine and no drug tax stamp, arguing the

district court erred in denying his motion to suppress the evidence obtained in a search of his vehicle. Concluding the search was not consensual, we reverse the district court and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Hogan's vehicle was stopped by officers after his brake light and taillights did not appear to function and he failed to signal a lane change. He does not challenge the stop. What occurred thereafter was disputed, with the two officers present at the stop relating different stories, and Hogan offering yet a third version.

Officer Christopher Robinson testified at the motion to suppress that it was his partner, Officer William Crowe, who first made contact with Hogan, as Robinson approached the passenger side of Hogan's vehicle. Robinson said that he could hear the conversation between Crowe and Hogan, but he could not recall if Hogan was able to produce a valid registration for the vehicle and also could not tell when or if Crowe returned Hogan's identification papers to Hogan. In any event, Robinson testified that during the interchange between Crowe and Hogan, Robinson observed that there was a baseball bat and a puppy in the back seat of Hogan's vehicle, and that when Robinson mentioned the bat to Hogan, he began sweating profusely, became nervous, and began stuttering. This purportedly led Robinson to believe there may be other weapons in the vehicle.

In contrast, Officer Crowe testified that Robinson made the contact with Hogan as Crowe approached the passenger's side of the vehicle. According to Crowe, "Robinson had the initial conversation and probably had most of it," but Crowe wrote the citation and then handed it to Robinson. Crowe remembered that Hogan handed Robinson his driver's license and later produced proof of insurance. Crowe recalled that while observing the passenger side of the vehicle he noticed a small dog along with a backpack on the rear floorboard.. He also noticed what he recognized as a book safe in the right front passenger's seat and that these are "generally" used to "store cash and narcotics."

Both officers agreed that Hogan was moved to the rear of the vehicle to look at the defective lights, and that he remained there until the citation was presented. Crowe said he returned Hogan's driver's license when the citation was presented, Crowe told Hogan he was free to go, and the officers started to walk back to their vehicle. Hogan returned to the driver's side of his vehicle and began to look at the vehicle's fuse box when Robinson asked him if he could search for weapons. At this point, the officers' testimony again diverged.

Robinson testified that after starting back to the patrol car, he stopped and asked Hogan if he could search the vehicle to see if there were weapons inside the vehicle. Hogan denied having any weapons; whereupon Robinson asked, "Do you mind if I search your vehicle for some weapons?" Then, Hogan walked to the back of his car, opened his trunk, and said there were no guns in the trunk. Robinson then repeated his question a third time, and Hogan said, "[Y]eah, go ahead." Rather than begin the search in the trunk, however, Robinson began to search the back seat and noticed a black bag. He then had additional conversation with Hogan, wherein Hogan said, "[H]ey, that is my personal stuff." Robinson said, "[Y]ou said I could search, correct?" Hogan then said, "[G]o ahead." A search of the black bag revealed a red scale with residue on it and some small clear plastic baggies. Robinson then found the book safe, found a key, opened it, and found paraphernalia consisting of "baggies, pipes, and miscellaneous items." Hogan was then arrested, and a search of his person revealed two baggies of crystal methamphetamine.

Crowe remembers these search details somewhat differently. When Robinson asked if Hogan had guns in his vehicle, Hogan denied it. Robinson asked again to "clarify" and heard Hogan give consent to search. The search began at the driver's door where a big filet knife was found, giving rise to a conversation wherein Hogan warned Robinson the knife was really sharp and was used at his previous place of employment. As Robinson then began to search the back seat area, Hogan protested and said, "[T]hat's my personal private property back there." Robinson stopped, and Hogan opened his trunk, said he did not have any weapons, and of-

fered his consent to search the trunk. Robinson, however, merely continued looking in the back seat despite no further request to continue that search. Crowe stated that he did not hear Robinson ask for permission to continue the search of the back seat and instead said that Hogan reiterated that the officers could search the trunk. After Robinson was observed searching in the back seat, he advised Crowe to place Hogan under arrest. Crowe was not asked about where in the sequence of events the book safe was opened, but they had to break the lock after Hogan denied that it was his.

Hogan testified that prior to Robinson asking to search his vehicle, no paperwork had been returned to him. Hogan also specifically denied being advised that he was free to go and stated that the officers had not walked away before asking for permission to search. Hogan stated that he never felt as though he was free to leave. He was asked for no further details of the encounter.

Hogan was charged with possession of methamphetamine and no drug tax stamp. He filed a motion to suppress, and it was at a hearing on that motion that the testimony cited above was adduced. Thereafter, the district judge initially took the matter under advisement, stating that he was not sure "which way it's going to go." The court's order made findings and conclusions, including the following:

"12. This Court finds it is more probably true than not that prior to the Officer Robinson's request to search or search:
   a) Officer Crowe returned Mr. Hogan's drivers' license, gave him a citation and told him he was free to leave;
   b) Officers Crowe and Robinson had started to walk back to their patrol vehicle;
   c) both officers were wearing their SCAT police uniforms and their department issued side arms; [and]
   d) the officers were driving/riding in a marked police vehicle with the overhead light bar flashing.
"13. While other facts concerning a small organizer, a backpack, the book-like safe, a small dog and Mr. Hogan being nervous, sweating, stuttering were presented, it is clear that the state is relying solely on consent to justify the search in this case. . . .
   . . . .

"19. In comparing and weighing the factors necessary for a valid consensual extension in this case with those reviewed in *Thompson*, [284 Kan. 763 (2007),] the facts in Mr. Hogan's case are similar. They are also similar to those in the unpublished case, *State v. Toevs*, [No. 100,065, unpublished opinion filed December 19, 2008]. It is apparent that the result here should be consistent with the majority view in *Thompson*.

"20. Like *Thompson* and *Toevs*, Mr. Hogan was lawfully stopped for a traffic violation. Instead of 'have a nice day,' Officer Robinson told Mr. Hogan he was 'free to go.' In all cases the officers took a couple of steps toward their patrol vehicle before they returned to again address the driver.

"21. Based upon the considerations and direction in *Thompson*, the objective standard set forth in that case and the facts before the Court here, the [Court] finds that this encounter had become consensual at the point Robinson asked to search Hogan's vehicle for weapons. Once the encounter is consensual, a request to search (as specifically authorized in *Thompson*) can [lead] to a valid consent to search.

"22. The exchange, as described by the officers in their testimony, does not lead the Court to the conclusion that Mr. Hogan immediately gave a blanket authorization for a full search. The testimony indicated Hogan expressed some reservations. Officer Crowe testified that Robinson asked Hogan twice if he could search for weapons and drugs before he heard Hogan consent. Officer Robinson testified that Hogan specifically indicated concern when he started to open the 'Nike' bag by stating, 'that is my personal stuff.' Robinson said he backed off and asked Hogan twice if he could search the bag and that Hogan then said, 'okay.' In both situations, the testimony indicated that Mr. Hogan ultimately gave consent to search the vehicle and the 'Nike' bag."

The matter was then tried on stipulated facts, and Hogan was convicted as charged. Hogan appeals his convictions, challenging the district court's ruling on the suppression issues.

## DID THE DISTRICT COURT ERR IN DENYING HOGAN'S MOTION TO SUPPRESS THE EVIDENCE RESULTING FROM THE VEHICLE SEARCH AND SUBSEQUENT SEARCH OF HIS PERSON?

Hogan argues on appeal that the evidence subject to his motion to suppress was gained through an unlawful detention, not a voluntary encounter, thereby violating his rights under the Fourth Amendment. When reviewing a district court's decision on a motion to suppress evidence, we extend deference to the district court's findings of fact that are supported by substantial competent evidence. Though the State bears the initial burden of establishing that a search and/or seizure is lawful, an appellate court does not

weigh evidence, pass on the credibility of witnesses, or resolve conflicting evidence. Once we determine that the district court's factual findings are adequately supported by the evidence, we use those facts to resolve the legal question regarding the lawfulness of the search and/or seizure. An appellate court possesses unlimited review over this ultimate legal question. See *State v. Pollman*, 286 Kan. 881, 886, 190 P.3d 234 (2008).

The questions framed by this appeal are: (1) Was the encounter between Hogan and the officers an unlawful detention beyond the reason for the traffic stop or did it transform into a consensual encounter by reason of the discussion between Hogan and the officers; (2) if there was a transformation into a consensual encounter, did that encounter remain consensual or did it transform back into an unlawful detention; and (3) was the search of Hogan's black bag consensual? See *State v. Thompson*, 284 Kan. 763, 775, 812-13,166 P.3d 1015 (2007).

*Consensual Encounter?*

Law enforcement officers are justified to detain a motorist for a traffic stop long enough to request the driver's license and vehicle registration (and proof of insurance), conduct a computer check on the driver's and automobile's information, and issue any citations. If no additional information providing reasonable suspicion is discovered during the course of the traffic stop, law enforcement must permit the motorist to leave without further delay. Thereafter, continued interaction between the motorist and law enforcement may only be justified by a consensual encounter. *Thompson*, 284 Kan. at 774.

"When it is alleged an investigatory traffic stop has turned into a consensual encounter, potential issues arise regarding the legality of: (1) the initial stop, *i.e.*, whether the law enforcement officer's action was justified at its inception; (2) the detention, *i.e.*, whether the length and scope of the detention were reasonably related in scope to the circumstances which justified the interference in the first place; and (3) the continuation of the encounter beyond the point in time when the purpose of the traffic stop was fulfilled, *i.e.*, whether the continuation was consensual or the officer gained a reasonable and articulable suspicion of illegal activity." *Thompson*, 284 Kan. 763, Syl. ¶ 5.

Whether an encounter between an individual and law enforcement may be properly viewed as a consensual encounter turns on whether the law enforcement officer's conduct, viewed within the totality of the circumstances, would have permitted a reasonable person to feel free to refuse the requests of law enforcement or otherwise terminate the encounter. *Pollman*, 286 Kan. at 887. Remembering that the determination whether a reasonable person would have felt free to terminate the encounter is fact driven, no list of factors is exhaustive or exclusive. *Thompson*, 284 Kan. at 811. And, no one factor can be legally dispositive. 284 Kan. at 803.

· Turning to the facts found by the district court, we are troubled by the apparent lack of findings addressing the disparity between the accounts of the officers. Although it is clear that the district court rejected the account of Hogan, our factual presentation above reflects considerable disparity between the accounts given by the officers, and it is not clear whether the district court resolved these disparities in reaching its findings or whether the court ignored or overlooked the disparities. For purposes of our analysis, we are unable to resolve these critical questions, so we focus initially on the facts expressly found by the district court and turn to the record only when those facts prove inadequate to apply our standard of review.

Despite the disparities in the officers' testimony, we conclude that the limited factual presentation of the district court is supported by substantial competent evidence, *except* for the important detail of which officer told Hogan he was free to go. Although the district court found that Robinson spoke these words, there is no record support for that finding; in fact, Robinson is equivocal on this point and Crowe testified *he* "told [Hogan] he was free to go." Thus, with this important exception, we restrict our legal analysis to·the limited facts set forth by the district court.

Among the factors to be considered is precisely what words were spoken by the officers. Here, although Crowe told Hogan he was "free to go," neither officer first sought permission to ask Hogan more questions but simply requested to search the vehicle for weapons. As noted by Hogan on appeal, Robinson's failure to request permission to talk further after disengagement with Hogan

may be a factor in determining whether Robinson's subsequent request to search was coercive. See *United States v. Mendez*, 118 F.3d 1426, 1429-30 (10th Cir. 1997).

But this is not the only troubling aspect of the encounter. Unlike in *Thompson*, here there were two officers involved in *direct contact* with Hogan, only one of whom had authorized Hogan to leave. In contrast to Crowe's authorization for Hogan to leave, it was Robinson who requested the permission to search, and this after an initial discussion with Hogan about the baseball bat. Clearly, this distinction could make a substantial difference to a reasonable person in trying to determine whether one is truly free to leave the scene. When more than one officer has direct contact with a defendant, particularly where the officers could be perceived as having different objectives, an authorization from only one of the officers that the defendant is free to go is not likely to lead a reasonable person to understand that he or she may leave the scene when the second officer requests to search the vehicle. Here, Robinson had expressed interest in the contents of the vehicle as Crowe attended to the writing of the traffic citation. Crowe's authorization could reasonably be perceived as an end to the traffic aspects of the stop, but Robinson's request thereafter to search the vehicle would certainly lead a reasonable person to doubt the efficacy of an authorization to leave.

Additionally, we note that even in Robinson's account, there were repeated requests to search the vehicle. There were at least three requests before the initial search began, and Hogan responded initially by denying any weapons and directing officers to his trunk. It is not clear from the testimony whether the consent given after three questions was limited to the trunk. In any event, our Supreme Court has noted that such repeated questions, which persist despite repeated denials of culpability, can be considered in determining whether an encounter is voluntary. See *State v. Thomas*, 291 Kan. 676, 246 P.3d 678 (2011).

Finally, there were factors detailed by the district court that bear against a mere voluntary encounter. These were (1) the fact that two officers were directly involved; (2) both officers were wearing SCAT police uniforms and their side arms; (3) the stop was effected

by a marked patrol vehicle; and (4) the overhead light bar remained flashing throughout the encounter.

Given these facts, Hogan argues on appeal that before a reasonable person could have left the scene he would have had to

"(1) decline Officer Robinson's repeated requests to search, (2) turn his back and walk away from uniformed officers carrying armed weapons, (3) climb in to his vehicle, (4) start the car, and then (5) drive away while Officers Robinson and Crowe stood in the roadway with the police cruiser's emergency lights still activated."

Obviously, the district court was troubled by the issue framed. The court expressed this in its memorandum decision:

"This Court finds it hard to accept that a citizen would easily disregard or decline an officer's request to search or answer more questions, get into their vehicle and simply drive away. Even if just moments before the officer had told the citizen they were free to leave. This is a citizen who has been stopped on the side of the road by uniformed law enforcement officer(s), driving a marked patrol vehicle, with lights flashing, having been asked to exit their vehicle and/or having been issued a citation for a traffic infraction. The Court questions how the citizen is supposed to determine if the officer is truly asking or directing. How they are to determine whether the officer has changed his/her mind about their right to leave, whether leaving the scene will result in the officer chasing them for failure to cooperate or whether refusal to comply with the officer's 'request' will result in additional legal complications? The trial courts, prosecutors, defense attorneys, law enforcement and our citizens are left to decide the rules of this complex and sometimes dangerous game of transferring a detention traffic stop into a consensual encounter. This Court respectfully agrees with the dissent in *Thompson*, that 'the majority expect far too much chutzpah' from a reasonable citizen in such a situation. That said, this Court is bound by the majority opinion and must apply the fact here to the law as set forth in *Thompson*."

We believe the district court may have perceived the *Thompson* decision as promulgating a mechanical test and that its application is somehow axiomatic. This is clearly *not* the case, however, as our Supreme Court has reminded us that the determination is "fact-driven" and "no list of factors can be exhaustive or conclusive." 284 Kan. at 811. Here, significant factual distinctions—especially the involvement of two officers having direct contact with Hogan—make any mechanical application of *Thompson* problematic.

Having detailed some of the factors that would have likely compelled a reasonable person to feel detained, we note that other

factors bear to the contrary. As in *Thompson*, there was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no threat, and no command. Additionally, here we had one of the officers indicating that Hogan was "free to go" and a disengagement of some degree. Weighing the factors carefully, we believe that Hogan's capacity for self-determination was critically impaired, and we conclude that under the totality of the circumstances a reasonable person would not have felt free to decline the officer's repeated requests for a search or otherwise terminate the encounter. Because we hold that the detention of Hogan did not become a consensual encounter, his detention was illegal and the evidence then obtained should have been suppressed as fruit of the poisonous tree. See *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

*If Consensual, Was There a Subsequent Transition Back to Detention?*

Even if we were to hold that there was an initial transformation to a consensual encounter, we must examine that encounter to see if there was yet another transition back to a detention. As our Supreme Court has recently noted, there is often a "second stage" to such an encounter, which we must analyze. See *Thomas*, 291 Kan. at 682; *State v. McGinnis*, 290 Kan. 547, 551, 233 P.3d 246 (2010). In doing so, we employ the same considerations and the critical inquiry is whether a reasonable person would continue to feel free to leave the scene throughout the encounter. Here, we conclude that once the officer extended the search to include Hogan's "black bag," no reasonable person would have felt free to leave.

Our conclusion is based on the totality of the circumstances, with specific focus on the timeframe after Hogan objected to any search of his "personal stuff." At this time, he was held at the rear of the car by another officer, the second officer was in the back seat of Hogan's car, and the officer's response to Hogan's objection was to remind him that there had already been consent given. The officer's response, "Well, you said I could search, didn't you?" would lead a reasonable person to believe that once consent was given generally for search, there could be no turning back. In other

words, the officer chose to intimidate Hogan rather than seek any supplemental consent for what Hogan perceived as an extension in the scope of the search. Moreover, as noted by the Supreme Court in *Thomas*, at no time during this second stage of the encounter was Hogan told he was free to leave or otherwise terminate the encounter. *Thomas*, 291 Kan. at 687.

Therefore, the search of the back seat of Hogan's car proceeded after Hogan was made to believe that he had no choice to terminate the encounter, but rather he was made to believe that he was compelled to endure whatever scope of search desired by the officer because Hogan had given his initial consent. For this additional reason, we conclude the evidence revealed by the extended search should have been suppressed.

*Consensual Search of the "Black Bag" in the Back Seat?*

Even if we were to have held that the encounter was consensual, we would next have to consider whether the search of Hogan's "black bag" was consensual. Although this argument was not specifically articulated by Hogan on appeal, we believe our Supreme Court has indicated that the analysis is mandatory. In *Thompson*, our Supreme Court stated that "[i]n addition to considering the nature of the seizure, when a search occurs the basis of the search must also be considered." 284 Kan. at 776 (citing *United States v. Drayton*, 536 U.S. 194, 206-08, 122 S. Ct. 2105, 153 L. Ed. 2d 242 [2002]). Accordingly, this step is critical to a comprehensive analysis of the encounter whether articulated in this manner by the defendant or not, as shown by the *Thompson* opinion. See 284 Kan. at 812.

This analysis requires consideration of whether there is substantial competent evidence that the consent given by Hogan was unequivocal and specific and given without duress or coercion, express or implied. See *Thompson*, 284 Kan. at 812; *State v. Moore*, 283 Kan. 344, 360, 154 P.3d 1 (2007). The factors to be considered are much the same as those applied to determine if an encounter is consensual. See *Thompson*, 284 Kan. at 812-13; *United States v. Hill*, 199 F.3d 1143, 1148-50 (10th Cir. 1999).

Here, we begin our analysis by noting the district court's findings support not only Hogan's general reservations, but that Hogan specifically indicated concern when the officer started to open the black bag or "Nike bag" by stating, "[T]hat is my personal stuff." Although the court went on to find that Hogan ultimately gave consent to search the bag, the court made no findings on the questions critical to the voluntariness of the consent given. Given no such findings, we examine the record to determine whether the consent given was indeed voluntary.

At the moment of Hogan's protest, he was held behind his vehicle by one officer, and the other officer was in his back seat about to look at the bag. Although the officers disagreed about the sequence of events, Robinson testified to the following events after Hogan protested:

"I said, well, I'm not interested in your personal belongings, I'm looking for weapons. And I backed out and I said, you said I could search, correct? And he said, yeah. Well, I asked him again, you said I could search your vehicle? He said, yeah. Is it okay if I search? He said, go ahead. So I went back to the back and that's where I found some more baggies."

In contrast, Crowe testified to the sequence of events as follows:

"[Officer Crowe:] He [Robinson] started to search in the backseat area and he [Hogan] made the comment about that's my personal private property back there. Officer Robinson stopped and then he asked him, he said, do you care if I go ahead and search it. I'm just looking for any drugs or weapons and he responded that he walked over and opened the trunk and said he didn't have any weapons in the trunk and said he could go ahead and search.

"Q. The defendant opened up the trunk?

"A. Yes.

"Q. And after he opened up the trunk, did you hear Officer Robinson ask again if he could continue to search?

"A. No not that I recall.

"Q. Okay. Did the defendant tell the officer after he opened the trunk you can keep searching?

"A. Well, he told him as he walked back to the trunk and opened it that he could search.

"Q. Did either you or Officer Robinson ask the defendant to open the trunk?

"A. No.

"Q. So does Officer Robinson continue looking in the backseat?

"A. He did.

"Q. And at that point are you still at the rear of the vehicle with the defendant?

"A. Yes, I'm standing there with him."

It does not give us comfort in the district court's refusal to suppress the evidence that the officers here were substantially in disagreement as to many of the essential aspects of this encounter. We note in particular that Robinson's account seems to admit that his requests and any consent given were limited in scope to a search for weapons; even when Robinson sought confirmation of the consent for the "black bag," it is not clear whether any additional consent given was beyond the limited scope of weapons. This limited scope appears to have been pretextual and unjustified by any legal measure given the conclusion of the traffic stop. See *Walter v. United States*, 447 U.S. 649, 656, 100 S. Ct. 2395, 65 L. Ed. 2d 410 (1980) (Scope of a search is limited by the terms of its authorization.). Crowe's account clearly indicates there was not consent to search in the back seat; instead, Hogan directed the officer to his trunk.

Examining the totality of the circumstances, we are unable to conclude that Hogan freely, voluntarily, specifically, and without implied coercion, gave his consent to search the bag in the back seat. In addition to the equivocal nature of any consent by Hogan, many of the same factors considered in evaluating the detention must be considered here, including the presence of two uniformed and armed officers, the holding of Hogan behind the vehicle by Crowe as Robinson searched the back seat, the continuing activation of the overhead light bar, and the repeated questions from Robinson. Additionally, we note that Robinson utilized aggressive language after Hogan's protestation when he responded, "[Y]ou said I could search, correct?" We view that language as indicating that acquiescence to the officer's extended search was compulsory. See *Thompson*, 284 Kan. at 811.

Examining the totality of the circumstances, we conclude that a reasonable person would not have felt free to leave upon Robinson's initial request to search the vehicle, and even if we were to conclude otherwise, any consensual encounter was transformed back to an illegal detention after Hogan objected to further search of his personal stuff. And finally, we are unable to conclude that

Hogan's consent to search the black bag was voluntary after he protested to that search. For these reasons, we reverse the district court and remand for further proceedings.

Reversed and remanded.

＊ ＊ ＊

BUSER, J., dissenting: I dissent because I believe the district court did not err in concluding that under the totality of circumstances the officers' conduct conveyed to a reasonable person that he or she was free to refuse the officers' requests or otherwise terminate the encounter. See *State v. Thompson*, 284 Kan. 763, 785, 166 P.3d 1015 (2007).

At the outset, my colleagues emphasize some inconsistencies in the officers' testimony. In a thoughtful and detailed memorandum order, however, the district court considered the officers' testimonial inconsistencies, together with their many consistencies, before concluding the "testimony as to the length and scope of the contact with . . . Hogan is relatively consistent." Based on this conclusion, and specific findings that the officers returned Hogan's driver's license, gave him the citation, told him he was free to go, and then started walking back to their patrol vehicle, the trial court held the result was controlled by *Thompson*. I agree. There was substantial competent evidence to support the district court's factual findings, and the court faithfully applied *Thompson's* precedent to those facts in arriving at its legal conclusion.

A comparison of the circumstances surrounding the *Thompson* case with the facts of the present case reveals the voluntary nature of the encounter between Hogan and the officers.

In both *Thompson* and this case, the driver was stopped for a municipal traffic violation during the nighttime. In both cases, two uniformed officers in marked police vehicles kept their emergency lights activated during the entire encounter. In the present case, the majority finds these facts "bear against a mere voluntary encounter." Slip op. at 11. In *Thompson*, however, our Supreme Court did not characterize the fact that two uniformed officers with side arms and riding in marked police vehicles established a coercive environment. Moreover, our Supreme Court specifically ob-

served that "the dark of night and the end of the traffic stop make the display of lights ambiguous and *not* a clear show of authority." (Emphasis added.) 284 Kan. at 811-12.

In both cases, the officer returned the driver's license with a warning or citation. In *Thompson*, our Supreme Court observed that the return of the driver's license and other documents tends to establish that an encounter was consensual. 284 Kan. at 811.

At the time the license was returned to the driver in both cases, the officer made a parting comment. In *Thompson*, the officer told the driver to "have a nice day." 284 Kan. at 769. Our Supreme Court concluded this comment was "not a clear statement that the traffic stop had ended." 284 Kan. at 811. In contrast, in the present case, the officer "returned Mr. Hogan's driver's license, gave him a citation and told him *he was free to go.*" (Emphasis added.) Whereas the officer's comment in *Thompson* was ambiguous, here the officer's statement was explicit and unmistakable. The officer's "free to go" instruction was also word for word what our Supreme Court in *Thompson* suggested would provide a driver with an "unequivocal signal that he was *free to go.*" (Emphasis added.) 284 Kan. at 809. In short, the facts of the present case, more so than in *Thompson*, favor a finding of a voluntary encounter.

My colleagues list some factors they conclude tend to show the encounter was voluntary. These include "no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no threat, and no command." But in addition to discounting the officer's "free to go" statement, they do not mention the significance of the district court's finding that after this comment was made, both officers "started to walk back to their patrol vehicle." Slip op. at 5, 10. In fact, according to Hogan's briefing, sufficient time elapsed in the interim that "Hogan was squatting outside of his car, and looking at his fuse box" when the officer recontacted him. This uncontroverted evidence of disengagement favors the district court's legal conclusion that this was a voluntary encounter.

In *Thompson*, the trial court viewed a videotape of the traffic stop and, according to our Supreme Court, found the officer

" 'did not leave the vicinity of the defendant after telling him to have a good day, but rather, immediately after the defendant had stated thank you to [the officer], he asked the defendant if he could ask him some additional questions. I do not believe there can be any question but that [the officer] did not disengage the defendant before asking his follow up questions.' " 284 Kan. at 769.

Under the circumstances, the Supreme Court concluded there was "not a clear physical disengagement." 284 Kan. at 811.

In the present case, in addition to the district court's finding of physical disengagement, even Hogan does not contest that disengagement occurred. The *Thompson* Supreme Court has stated that while disengagement is not a prerequisite to establishing a voluntary encounter, "[t]he physical movement of a law enforcement officer is a factor that can be taken into account when considering whether a reasonable person would feel free to refuse an officer's request or otherwise terminate his or her encounter with an officer." 284 Kan. 763, Syl. ¶ 19. Unlike the facts in *Thompson*, the officers' disengagement in the present case was uncontroverted and tended to show the voluntary nature of the encounter.

The *Thompson* court, in concluding under the circumstances of that case that a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter, listed the following facts in support of their conclusion: " 'There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice.' [Citation omitted.]" 284 Kan. at 789. In the present case, in addition to these factors listed in *Thompson*, there was evidence of an unequivocal signal that the driver was free to go and clear disengagement by the officers—additional facts tending to establish a voluntary encounter which were *not* present in *Thompson*.

The majority attempts to distinguish *Thompson* based on the fact that two officers engaged Hogan during this vehicle stop. My colleagues hypothesize that because "there were two officers involved *in direct contact* with Hogan, only one of whom had authorized Hogan to leave," and because the other officer "could be perceived as having different objectives," a reasonable person could "doubt the efficacy of an authorization to leave." Slip op. at 10-11.

I question this supposition. Both officers were on routine patrol and riding together in a single police vehicle. The officers made a routine vehicle stop in order to give the driver an ordinary traffic citation. When one officer told Hogan he was free to leave and *both* officers started back towards their police vehicle, a reasonable person would not question the efficacy of the authorization to leave. Clearly, Hogan did not—he returned to his vehicle and began to inspect the fuse box.

Of course, two officers were also present in *Thompson*, but one officer provided "back-up" and did not have "any direct contact with Thompson." 284 Kan. at 768. But one fact further distinguishes the two cases. In *Thompson*, the back-up officer arrived shortly after the initial car stop in a separate police vehicle. This circumstance would more likely cause a reasonable person to wonder why an additional officer was called to the scene and whether this back-up officer also agreed with the traffic officer's statement that the traffic encounter had concluded. See *State v. Thomas*, 291 Kan. 568, 246 P.3d 678, 686 (2011) (a driver seeing and hearing a single officer asking for another officer to come to the scene "would strongly suggest to a reasonable person that the called officer was being asked to 'back-up' the calling officer in ways besides just helping to ask more questions—which the person is free to ignore. [Citation omitted.] This element is *not* present with the simultaneous appearance of two officers.") (Emphasis added.)

Additionally, in finding a voluntary encounter involving the back-up officer in *Thompson*, our Supreme Court did not bifurcate the officers' authority or otherwise suggest that all officers present must verbally join in any "clear statement that the traffic stop had ended." 284 Kan. at 811. And only recently our Supreme Court explicitly reaffirmed Kansas law "that in some situations, the presence of more than one officer is *not* indicative of a coercive atmosphere." (Emphasis added). *Thomas*, 291 Kan. at 686.

The majority also cites *United States v. Mendez*, 118 F.3d 1426, 1429-30 (10th Cir. 1997), for the proposition that "Robinson's failure to request permission to talk further with Hogan may be a factor in determining whether Robinson's request was coercive." *Hogan*, slip op. at 10. *Mendez* does not support this proposition.

The Tenth Circuit Court of Appeals did not decide the consensual encounter question in *Mendez* because the trial court failed to make a critical finding. See 118 F.3d at 1430-31. Nothing else in the cited pages suggests a "failure" by Officer Robinson to request permission to talk further.

Moreover, as a general rule, law enforcement officers may simply initiate questioning without formalities. See *United States v. Harris*, 313 F.3d 1228, 1234 (10th Cir. 2002); *State v. Reason*, 263 Kan. 405, 412, 951 P.2d 538 (1997). To the extent a request by Officer Robinson for permission to talk further might have alerted Hogan that he was free to leave after the traffic stop, it would have been largely superfluous because earlier Officer Crowe directly told him he was "free to go."

In summary, under the totality of the circumstances in the present case—which include factors more favorable to a finding of a voluntary encounter than in *Thompson*—"[n]othing about the encounter indicated duress or coercion." 284 Kan. at 812.

I have one last point of disagreement. After my colleagues conclude the encounter *was not* voluntary, they assume the encounter *was* voluntary and state: "[W]e must examine that [voluntary] encounter to see if there was yet another transition back to a detention." *Hogan*, slip op. at 13. In its last analysis, the majority then proceeds to consider "whether the search of Hogan's bag was consensual." Slip op. at 14.

I would not review these additional legal issues for the simple reason that Hogan did not raise them below, they were not decided by the district court, and they were not raised, briefed, or argued on appeal.

In the district court, Hogan testified that the officers failed to return his driver's license, the traffic citation, or advise him that he was free to go prior to asking to search the vehicle. Based on this testimony, Hogan's counsel argued "[f]rom that point on it is an illegal stop, period." Hogan takes the same tack on appeal, identifying as "the issue in this case . . . whether, at the time the officer asked for consent to search the vehicle, the detention had impermissibly extended beyond the original traffic stop." Hogan contended below and on appeal that the encounter was an illegal de-

tention at the time the officers asked permission to search the car. Hogan has consistently asserted that the incriminating evidence found in the search should be suppressed—not because his consent to search was involuntarily obtained—but because it was the fruit of the poisonous tree, the illegal detention which preceded the officer's request to search.

My colleagues concede that the issue of the voluntariness of Hogan's consent to search was not raised by Hogan on appeal. They then proceed to analyze the issue and base their judgment, in part, on the conclusion that Hogan's consent to search was involuntarily obtained. The majority cites *Thompson* for the proposition that this additional "analysis is mandatory . . . whether articulated in this manner by the defendant or not." *Hogan*, slip op. at 14.

I believe this is a misreading of *Thompson*. It is true that our Supreme Court in *Thompson* separately analyzed whether the encounter and the resulting two consents to search were voluntary. This is because Thompson raised both issues below and on appeal. Our Supreme Court specifically identified the two issues raised by the defendant: "Thompson argues evidence obtained during the warrantless searches should be suppressed because he was detained beyond the permissible scope of a traffic stop *and did not voluntarily consent to the searches*." (Emphasis added.) 284 Kan. at 767.

There are two long-standing, general rules of law in our state that are dispositive of this matter. First, issues not raised before the trial court may not be raised on appeal. *State v. Warledo*, 286 Kan. 927, 938, 190 P.3d 937 (2008). Second, an issue not briefed by the appellant is deemed waived or abandoned on appeal. *State v. Martin*, 285 Kan. 994, 998, 179 P.3d 457, *cert. denied* 129 S. Ct. 192 (2008). Accordingly, because the additional issues determined by my colleagues were not raised by Hogan or ruled on by the district court, and not raised, briefed, or argued on appeal, I would find they are not proper issues for appellate review.

I would affirm the district court.