(157 P.3d 644)
No. 96,115

STATE OF KANSAS, *Appellee*, v. TRACEY A. YOUNG, *Appellant*.

—

Opinion filed May 4, 2007.

*Matthew J. Edge*, of Kansas Appellate Defender Office, for appellant.

*Jay H. Sizemore*, assistant county attorney, and *Phill Kline*, attorney general, for appellee.

Before PIERRON, P.J., MALONE and BUSER, JJ.

MALONE, J.: Tracey A. Young appeals his convictions of one count of possession of methamphetamine and one count of possession of drug paraphernalia. Young claims the district court erred in denying his motion to suppress evidence. Young had been approached by a police officer in a city park, and he consented to a search of his person, which led to his arrest. This case raises a single issue: Was Young's contact with the police officer a voluntary encounter or an investigatory detention?

The facts are undisputed. While on routine patrol in the evening of February 25, 2005, Officer Brian Rousseau saw Young and Richard Beatty in a city park in Newton, Kansas. From his patrol vehicle, Rousseau observed Beatty hand something to Young, and the two men parted ways. Rousseau had prior contacts with Beatty and knew that he was involved with illegal drugs. Based on his observation of the exchange, Rousseau believed he may have witnessed a drug transaction.

Rousseau continued to observe Young as he walked through the park. Prior to Young leaving the park, Rousseau exited his vehicle and approached him on foot. According to Rousseau's testimony, the following exchange took place:

"Q. [By the State] Officer Rousseau, when you made contact with Mr. Young, what happened then?

"A. I asked him what was up, what was going on, where he was headed. He told me his girlfriend's house. I asked where he was coming from, he said his apartment complex on Boyd.

"Q. Okay. Did you—during your conversation with Mr. Young did you ob— did anything catch your attention?

"A. While speaking with him I smelled a pretty strong odor of marijuana emitting from his person.

"Q. What did that prompt you to do?

"A. Based on what I observed between him and the—the subject who was later identified as Richard Beatty, I asked him if he had anything illegal on his person.

"Q. What did he say?

"A. He stated no.

"Q. What did you ask him after that?

"A. I asked him if he minded if I could search him.

"Q. And what were you searching for, did you tell him that?

"A. I just asked him if I could search him for illegal contraband.

"Q. And what was his response to that?

"A. He said I could search him.

"Q. Okay. What did you do after you received permission to search his person?

"A. Um, I felt on the outside of his right front pocket and, uh, while searching or feeling that pocket I felt a long tube in his pocket. I asked him what it was.

"Q. Okay. What did he tell you it was?

. . . .

"A. Well, he stated it was—It's a pen.

. . . .

"Q. [By the State] What happened after that?

"A. I asked him if I could remove the pen from his pocket.

"Q. Did he allow you to do that?

"A. Yes, he did.

"Q. Did he give you permission to do that?

"A. Yes, he did.

"Q. When you removed—what was it when you removed it?

"A. It was just a hollowed ink tube cartridge just where there was no—just a pen without the ink cartridge in it.

"Q. Okay. Anything about that catch your attention, Officer?

"A. Uh, based on my training and experience, that's a common thing that people use to ingest illegal narcotics. Also inside the tube I saw white residue within the tube.

"Q. And based on your training and experience what did you believe this white residue to be?

"A. It was either methamphetamine or cocaine."

Rousseau testified that the hollow ink tube field tested positive for methamphetamine and Young was placed under arrest.

Young was charged with one count of possession of methamphetamine and one count of possession of drug paraphernalia. Young filed a motion to suppress the evidence seized from his person. The district court held an evidentiary hearing in which Rousseau was the only witness who testified. After hearing the evidence, the district court denied the suppression motion. The district court found that Rousseau did not have reasonable suspicion of criminal activity to detain Young, but the court found that Young had voluntarily consented to the search during a voluntary encounter with Rousseau.

The case proceeded to a bench trial on stipulated facts consisting of the suppression hearing transcript, police reports of the arrest, and KBI lab reports. Young preserved his motion to suppress and continued to object to the admission of any physical evidence taken by the police and any statement he may have made at the time of the search. The district court found Young guilty as charged. Young timely appeals.

Young claims the district court erred in denying his motion to suppress evidence. Young maintains his encounter with Rousseau was not voluntary. Rather, Young asserts he was seized by Rousseau without reasonable suspicion of criminal activity thereby making his detention illegal. The State maintains the contact between Young and Rousseau was a voluntary encounter, which is not considered a seizure under the Fourth Amendment to the United States Constitution.

In reviewing a district court's decision regarding suppression of evidence, an appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. An appellate court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006). Young does not dispute the district court's findings of fact. When the material facts to a district court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006).

The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Section 15 of the Kansas Constitution Bill of Rights contains similar language and "provides protection identical to that provided under the Fourth Amendment to the United States Constitution. [Citation omitted.]" *State v. Morris*, 276 Kan. 11, 17, 72 P.3d 570 (2003).

There are four types of police-citizen encounters. The first type is a voluntary encounter, which is not considered a seizure under

the Fourth Amendment. *State v. Hill*, 281 Kan. 136, 141, 130 P.3d 1 (2006). The second type is an investigatory detention or *Terry* stop, in which an officer may detain any person in a public place if the officer reasonably suspects that the person is committing, has committed, or is about to commit a crime. K.S.A. 22-2402(1); see *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). The third type of encounter is a public safety stop in which an officer may approach a person to check on his or her welfare when the officer can articulate specific facts indicating a concern for the public's safety. *State v. Vistuba*, 251 Kan. 821, 824, 840 P.2d 511 (1992). The fourth type of encounter between law enforcement officers and citizens is an arrest. K.S.A. 2006 Supp. 22-2401.

Courts have sometimes struggled with the distinction between a voluntary encounter and an investigatory detention. Both instances involve contact between a law enforcement officer and a citizen, usually precipitated by the law enforcement officer. However, in a voluntary encounter, the citizen is always free to leave or terminate the encounter. *State v. McKeown*, 249 Kan. 506, 509, 819 P.2d 644 (1991). A voluntary encounter is not considered a seizure and does not require the officer to have reasonable suspicion of criminal activity. Conversely, a person is seized when an officer displays his or her authority and restrains the person's freedom to leave. *Hill*, 281 Kan. at 142. This requires the officer to have reasonable suspicion of criminal activity. The test for whether a seizure has occurred is based on what a reasonable person would believe under the totality of the circumstances surrounding the incident. 281 Kan. at 145. We will review leading cases drawing the distinction between a voluntary encounter and an investigatory detention before determining which instance applies to Young's case.

### United States Supreme Court decisions

In *Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983), two plain-clothes detectives approached the defendant at Miami International Airport believing he fit the profile of a drug smuggler. The detectives identified themselves as police officers and asked the defendant if he had a moment to speak with

them. The defendant replied that he did. The detectives asked the defendant to produce his airline ticket and driver's license, and the defendant complied. The name on the defendant's driver's license did not match the name on his ticket, and the defendant became noticeably more nervous as he spoke with the detectives. The detectives then informed the defendant that they were narcotics investigators and that they had reason to suspect him of transporting narcotics. Without returning the defendant's ticket or identification, the detectives asked the defendant if he would accompany them to a nearby room; the defendant acquiesced. Without the defendant's consent, one of the detectives gathered the defendant's luggage while the other detective waited with the defendant in the nearby room. The detectives asked the defendant if they could search his luggage, and the defendant produced a key for one of the suitcases. The detectives opened the suitcase and discovered drugs. The defendant did not have the combination for the second suitcase so the detectives asked if they could break it open. The defendant replied they could do so. The second suitcase also contained drugs, and the detectives arrested the defendant.

In examining the nature of the contact between the defendant and the detectives, the Supreme Court recognized that law enforcement officers may engage in voluntary encounters with citizens in public places:

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. [Citations omitted.] Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. [Citation omitted.] The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. [Citations omitted.] He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. [Citation omitted.] If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed." 460 U.S. at 497-98.

The Supreme Court ultimately determined that when the detectives asked the defendant to accompany them to the separate

room while retaining his ticket and driver's license, the defendant was effectively seized for Fourth Amendment purposes. 460 U.S. at 501-03. The Court held the defendant had been illegally detained when he consented to the search of his luggage and, therefore, his consent was tainted by the illegal detention and was not voluntary. 460 U.S. at 507-08. Although the Court suppressed the evidence under the facts, the Court emphasized the contextual nature of a Fourth Amendment analysis:

"We do not suggest that there is a litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop. . . . [T]here will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment." 460 U.S. at 506-07.

The Supreme Court reaffirmed the voluntary encounter principles from *Royer* in *Florida v. Bostick*, 501 U.S. 429, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991). In *Bostick*, two officers, in uniform and carrying a weapon, boarded a bus and randomly asked the defendant to provide his ticket and identification for inspection. After matching the defendant's identification to his ticket, the officers immediately returned the documents to the defendant. Nevertheless, they continued the encounter by identifying themselves as narcotics agents and asking the defendant for consent to search his luggage. The defendant denied that he consented to the search, but the Florida trial court believed the officers' testimony that consent was given. The officers discovered drugs in the defendant's luggage and arrested him.

The Florida Supreme Court ruled the encounter was an illegal detention, focusing on the fact that the defendant's movements were confined because he was a passenger on a bus. The United States Supreme Court rejected this analysis and stated:

"There is no doubt that if this same encounter had taken place before Bostick boarded the bus or in the lobby of the bus terminal, it would not rise to the level of a seizure. The Court has dealt with similar encounters in airports and has found them to be 'the sort of consensual encounter[s] that implicat[e] no Fourth Amendment interest.' [Citation omitted.] We have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions

of that individual, [citations omitted]; ask to examine the individual's identification, [citations omitted]; and request consent to search his or her luggage, [citation omitted]—as long as the police do not convey a message that compliance with their requests is required." 501 U.S. at 434-35.

In *Bostick*, the Court set forth an objective standard for determining whether a seizure has occurred, and the Court emphasized the determination must be made by examining the totality of the circumstances:

"We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. That rule applies to encounters that take place on a city street or in an airport lobby, and it applies equally to encounters on a bus." 501 U.S. at 439-40.

Applying Fourth Amendment jurisprudence to the facts in *Bostick*, the Supreme Court expressed doubt that the officers had ever seized the defendant. The Court noted the two officers had approached the defendant and asked for his identification, ticket, and consent to search his luggage. There was no evidence of any overt acts of intimidation or coercion. However, because the Florida trial court had not made express findings of fact, the Supreme Court remanded the case for further findings regarding whether the officers had seized the defendant under the totality of the circumstances. 501 U.S. at 437.

In another case, *Ohio v. Robinette*, 519 U.S. 33, 136 L. Ed. 2d 347, 117 S. Ct. 417 (1996), the Supreme Court addressed whether a law enforcement officer must advise a citizen that he or she is "free to go" before an encounter can be considered voluntary. In *Robinette*, an officer stopped the defendant for speeding. After running a check on the defendant's driver's license that did not show any previous violations, the officer asked the defendant to step out of his car. The officer gave the defendant a verbal warning about speeding, returned his driver's license, and asked, " 'One question before you [leave]: [A]re you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?' " 519 U.S. at 35-36. The defendant responded that he was

not, and the officer asked if he could search the car. The defendant consented. The officer discovered illegal drugs inside the car.

The Ohio Supreme Court held the search resulted from an unlawful detention and adopted a bright-line rule that citizens stopped for traffic offenses must be clearly informed by the detaining officer that they are free to go before the officer can attempt to engage in a consensual interrogation. The United States Supreme Court granted certiorari and considered the issue in light of its earlier rulings in *Royer* and *Bostick*. The Supreme Court held the Fourth Amendment does not require officers to inform individuals they are free to go before engaging in consensual interrogations, preferring an inquiry based on all the circumstances surrounding the encounter:

" 'While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent.' [*Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973)]. And just as it 'would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning,' [412 U.S.] at 231, so too would it be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary." 519 U.S. at 39-40.

It should be noted that on remand, the Ohio Supreme Court still suppressed the evidence discovered inside the defendant's car. The court found the officer did not have reasonable suspicion of criminal activity to detain the defendant beyond the traffic stop and determined the defendant's ultimate consent to the car search was involuntary under the totality of the circumstances. *State v. Robinette*, 80 Ohio St. 3d 234, 244-46, 685 N.E. 2d 762 (1997).

*Royer*, *Bostick*, and *Robinette* clearly endorse the concept that law enforcement officers may engage in voluntary encounters with citizens in public places. An officer does not need reasonable suspicion of criminal activity in order to engage a citizen in a voluntary encounter. An encounter between a citizen and a law enforcement officer in a public place is considered voluntary as long as a reasonable person would feel free to decline the officer's requests for information or otherwise terminate the encounter. This determination must be made by examining the totality of the circum-

stances. The officer is not required to inform the citizen that he or she is free to go before an encounter can be considered voluntary, but this is one factor to be considered under the totality of the circumstances.

### Kansas decisions

The Kansas Supreme Court acknowledged the concept of a voluntary encounter in *McKeown*, 249 Kan. 506. *McKeown* addressed the issue of whether the police had grounds to stop the defendant's vehicle. The stop of a moving vehicle by law enforcement is always considered a seizure. 249 Kan. at 510. The court discussed the standard set forth in *Terry*, 392 U.S. 1, that an officer must have a reasonable and articulable suspicion of criminal activity in order to justify a stop. However, in dicta, the court added: "An officer who does not have reasonable suspicion to justify a *Terry* stop may, however, approach an individual on the street for investigative purposes. [Citations omitted.] The officer can ask the individual's name and request identification but cannot force the individual to answer. The individual is free to leave." 249 Kan. at 509.

The Kansas Court of Appeals addressed the constitutionality of a voluntary encounter in *State v. Crowder*, 20 Kan. App. 2d 117, 887 P.2d 698 (1994). In *Crowder*, two police officers on routine patrol parked in a motel lot known for drug activity. The defendant approached the motel and knocked on the door to one of the rooms. Then, noticing the patrol vehicle parked nearby, the defendant walked over to the driver's side window of the patrol vehicle. The officer rolled down the window and asked the defendant his name and what he was doing. The defendant initially stated his name was David and he was looking for a friend. The officer exited the vehicle and asked the defendant if he could pat him down for weapons. The defendant agreed to the pat down, and no weapons were found. The officer again asked the defendant his name, and this time the defendant stated his name was Bryan. While the defendant and the officer were talking, the second officer noticed that the defendant seemed to have something in his mouth. The second officer asked the defendant to open his mouth, and the

officer found a small plastic baggie containing cocaine inside the defendant's left cheek.

On appeal, the defendant argued the officers had seized him and his consent to the search was not voluntary due to the coerciveness of the encounter. However, the court considered the encounter voluntary and stated:

"Crowder contends that he did not believe he could end the contact with the officers because there were two of them, armed and in uniform, and neither informed him that he was free to leave. Crowder cites *U.S. v. Ward*, 961 F.2d at 1259, and *U.S. v. Bloom*, 975 F.2d 1447 (10th Cir. 1992), for the proposition that these factors establish the coerciveness of the encounter. While some of these factors are present in *Ward* and *Bloom*, the court in both cases relied heavily on the fact that the 'seizures' took place in a private compartment on a railroad car and that the officers asked ' "focused, potentially incriminating questions." ' 975 F.2d at 1454.

"Neither of these factors is present here. While it is true that there were two officers with Crowder, the contact occurred in a public place and the officer's request for Crowder's name was neither coercive nor incriminating. [Citation omitted.]

. . . .

"Crowder correctly argues that the officers' unspoken belief that Crowder was free to go does not preclude the existence of a seizure. Likewise, an individual's view of the situation colored by his or her fear of being caught engaging in criminal activity cannot be grafted onto an otherwise innocent encounter to convert it into a seizure. [Citation omitted.]" 20 Kan. App. 2d at 121.

Thus, the court affirmed the denial of the defendant's suppression motion, finding the defendant's consent was voluntary under the totality of the circumstances. 20 Kan. App. 2d at 122.

The Kansas Supreme Court upheld a voluntary encounter in *State v. Reason*, 263 Kan. 405, 951 P.2d 538 (1997). In *Reason*, two police officers approached a vehicle parked in a public parking lot and found two persons were sleeping inside the vehicle with the doors open. The officers awoke the defendant who was sleeping in the driver's seat and asked if he was okay. The officers then requested identification from both occupants of the vehicle. The defendant informed the officers he did not have any identification as his wallet had been stolen, but the defendant insisted he owned the vehicle. The officers ran a check on the vehicle's identification number which confirmed the defendant was the owner. While one

officer was still checking the passenger's identification, the other officer informed the defendant he was free to go. Shortly thereafter, however, the officer asked the defendant for permission to search the vehicle. The defendant consented, and the officers found illegal contraband inside the vehicle.

The Kansas Supreme Court discussed the United States Supreme Court holdings in *Royer* and *Bostick* and determined the police contact began as a voluntary encounter when the officers first approached the parked vehicle to check on the occupants. 263 Kan. at 412. However, the court determined the encounter transformed into an investigatory detention based on reasonable suspicion when the defendant claimed ownership of the vehicle but failed to produce either the vehicle registration or personal identification. 263 Kan. at 412-13. Once the officers had completed the warrant check and informed the defendant he was free to go, the court determined the contact transformed back into a voluntary encounter. The court noted the officers did not thwart any attempt by the defendant to leave, make any untoward demonstration of authority, show weapons, or engage in other coercive behavior. 263 Kan. at 413.

The court determined the defendant's consent to the search was voluntary under the circumstances. The court noted there was no taint to purge from the consent because there had been no illegal detention. 263 Kan. at 410. The court also noted the officer had specifically informed the defendant he was free to go, but found this factor was not conclusive in determining the voluntariness of the defendant's consent:

"The 'free to go' signal is a factor in determining whether [the defendant] objectively felt under police coercion at the time of his consent. Even if [the officer] had failed to tell [the defendant] he was free to go before requesting consent to the search, that may not necessarily have invalidated the consent. [Citations omitted.]" 263 Kan. at 414.

In *State v. Grace*, 28 Kan. App. 2d 452, 17 P.3d 951, *rev. denied* 271 Kan. 1039 (2001), the defendant was a passenger in a car that pulled up to a bar so that another passenger could check whether a friend was inside. Two officers approached the car to make sure the driver was not intoxicated. The officers saw no signs of alcohol

or drugs inside the car. Nevertheless, the officers conducted a warrant check on the occupants of the car, which took at least 15 minutes. One of the officers testified that the occupants of the car were free to go while the warrant check was being conducted, but neither of the officers ever informed them of this fact. Ultimately, one of the officers asked the defendant if the officer could search him, and the defendant consented. The officer found a black pouch on the defendant, which contained methamphetamine.

The Court of Appeals suppressed the evidence on the ground that the defendant had been detained without reasonable suspicion of criminal activity, and the illegal detention tainted the defendant's consent to the search, thereby making the consent involuntary. In reaching this result, the court determined the defendant's prolonged detention converted what may have been a voluntary encounter into an investigatory detention:

"Even if the officers' initial approach of [the defendant] and the other occupants of the car did not qualify as a stop, the continued interaction for approximately 25 minutes while the warrant checks were run converted what could have been characterized as a voluntary encounter into an investigatory detention. Although officers are entitled to approach a stopped car and ask a few questions, [citations omitted], they clearly did more than that here." 28 Kan. App. 2d at 458.

In *State v. Morris*, 276 Kan. 11, 72 P.3d 570 (2003), the Kansas Supreme Court elaborated on what circumstances constitute a show of authority sufficient to effectuate a seizure. Police officers observed the defendant speak with a woman who had left an apartment which was under surveillance as a possible methamphetamine lab. The officers attempted to follow the defendant in his pickup truck but were unsuccessful due to traffic. Later in the day, the officers observed the defendant parked in his pickup truck on a rocky jetty-breaker at a state lake, and the police pulled their vehicle behind the defendant's pickup truck. The police activated their vehicle's emergency lights even though they were well off the roadway. The officers approached the pickup truck and detected a chemical odor associated with methamphetamine, and they observed additional items associated with the production of methamphetamine inside the pickup truck on the passenger side floor-

board. The police searched the pickup truck and uncovered a fairly complete methamphetamine lab.

In evaluating the nature of the encounter, the court determined that a seizure occurs when "there is the application of physical force" or when "there is a show of authority which, in view of all the circumstances surrounding the incident, would communicate to a reasonable person that he or she is not free to leave [citation omitted] and the person submits to the show of authority. [Citation omitted.]" 276 Kan. at 18-19. Examples of a show of authority include activation of sirens or flashers, a command to halt, a display of weapons, or an attempt to control the suspect's ability to flee or the direction of travel during a chase. 276 Kan. at 20. Under the facts presented, the court determined the defendant was seized when the police activated their vehicle's emergency lights for other than safety reasons and, at that moment, the police did not have reasonable suspicion the defendant was engaged in criminal activity. It is significant to note that the activation of emergency lights by the police on a highway or other busy location for safety reasons may not have signaled a seizure. See 276 Kan. at 23-24.

We conclude our review of cases with *State v. Lee*, 283 Kan. 771, 156 P.3d 1284 (2007). In *Lee*, two police officers were dispatched to a public park in response to a report of a suspicious man walking through the park, looking on the ground, and hitting the ground with a stick. The officers approached the man, who was later identified as the defendant, requested his identification, and asked what he was doing. The defendant explained he was looking for his wallet that he had lost the previous week. Although the defendant's behavior was not threatening, one of the officers asked if he had any weapons. The defendant removed two knives from his pocket. The officer then asked for permission to conduct a pat-down search for weapons, and the defendant complied. The officer discovered a bulge in the defendant's pocket and, without asking for consent, the officer reached in the pocket and removed a rolled-up baggie which contained methamphetamine.

On appeal, the Kansas Supreme Court found the police officers' contact with the defendant was a voluntary encounter. 283 Kan.

at 777. The court determined that a reasonable person in the defendant's situation would have felt free to disregard the officers and go about his or her business. The court noted that even though there were two officers, there was no evidence the officers displayed their weapons, physically restrained the defendant, or spoke with a commanding tone of voice. 283 Kan. 771, Syl. ¶¶ 3, 4. The court also determined that depending on the facts of the case, an individual may consent to a request for a pat-down search for weapons without transforming a voluntary encounter into an investigatory detention. 283 Kan. 771, Syl. ¶ 5. The court found the defendant's consent to the pat-down search was voluntary under the circumstances. In doing so, the court specifically rejected the district court's conclusion that the officers' presence was coercive merely because the officers were wearing uniforms and carrying standard-issue weapons. 283 Kan. at 777-78. However, the court ultimately suppressed the evidence seized from the defendant because the court concluded the officer violated the plain feel exception to the requirement for a search warrant when he removed the baggie from the defendant's pocket while searching only for weapons. 283 Kan. at 780.

### Young's encounter

Turning to the facts of this case, Young claims his encounter with Rousseau was a seizure rather than a voluntary encounter. Young contends Rousseau exerted three separate displays of authority which communicated that Young was seized: (1) Rousseau was wearing his police uniform and weapon, (2) Rousseau blocked Young's path of travel, and (3) Rousseau demanded that Young answer questions.

There is simply nothing in the record to support Young's last two contentions. Rousseau's testimony at the suppression hearing was undisputed. The evidence indicated that Rousseau exited his vehicle and approached Young on foot before he left the city park, but there was no evidence that Rousseau blocked Young's path or prevented him from leaving. There was also no evidence that Rousseau demanded that Young answer any questions. Rousseau's testimony, set forth verbatim in this opinion, reflects that Rousseau

only asked questions of Young, and he did not give any orders or make any demands for Young to answer.

This leaves the fact that Rousseau was wearing his police uniform and weapon as the only display of authority. Young argues that a "police uniform is a display of authority, and should be taken into account in determining whether a police-citizen encounter is voluntary." However, the mere fact that an officer is in uniform and carrying a weapon does not render the encounter coercive. See *Bostick,* 501 U.S. at 434-39; *Lee,* 283 Kan. at 778. The situation would have been different had Rousseau drawn his weapon on Young or displayed his weapon in any manner to threaten or intimidate Young. These were not the facts, and obviously Rousseau was not required to shed his uniform or remove his weapon before approaching Young.

In determining that the encounter between Rousseau and Young was voluntary, the district judge found:

"Under the facts and circumstances elicited at the hearing, I cannot find that the officer's actions conveyed a message that compliance was required. The officer made no threats or show of force, or coercion, other than his mere presence in a uniform. . . .

"The defendant may have felt or thought he had to comply with the officer's requests, however, the officer took no action to lead to such a mistaken belief. The officer asked, and did not demand or require the defendant to comply."

The district court's findings are supported by the record. The facts here are similar to the facts in *Lee* and possibly even less characteristic of a seizure than the facts in *Lee* because Young was approached in a park by only one officer. Rousseau did not activate the emergency lights before he exited his vehicle. Rousseau did not command Young to stop, speak in a commanding tone of voice, physically restrain Young, attempt to control Young's ability to flee, or otherwise indicate to Young that he was not free to leave. See *Lee,* 283 Kan. at 776-77; *Morris,* 276 Kan. at 18-20. Although the record does not state exactly how much time Rousseau spent questioning Young, it appears from the testimony that the entire encounter lasted only a few minutes.

Rousseau did not inform Young that he was free to leave or that he was not required to answer any questions. However, an officer

is not required to give a citizen such advice before an encounter can be considered voluntary. See *Robinette*, 519 U.S. at 39-40; *Reason*, 263 Kan. at 414. Whether the citizen subjectively knows that he or she is free to decline to answer an officer's questions is only one factor to be considered under the totality of the circumstances. *Reason*, 263 Kan. at 414; *Crowder*, 20 Kan. App 2d at 121. Young did not testify as to his understanding of the nature of his encounter with Rousseau. Viewed objectively, Young was always free to leave and he could have declined at any time to answer Rousseau's questions. Under the totality of the circumstances, the encounter between Rousseau and Young was voluntary.

After Young responded to Rousseau's initial questions, Rousseau asked for permission to search Young's person. Young consented. The district court found Young's consent to be voluntary:

"The defendant was asked if the officer could search and the defendant consented to the intrusion. The officer did not order him to allow the search, he simply asked. The defendant was free to say no, and absent any objective coercive behavior by the officer, there is nothing in the record to suggest the defendant's consent was a result of improper coercion or threat."

These findings are also supported by the record. Because Young's detention was not illegal, there was no taint to purge from his consent. *Reason*, 263 Kan. at 410. Young's consent was voluntary under the circumstances, and the evidence discovered as a result of the search was lawfully obtained.

As the United States Supreme Court stated in *Royer*, 460 U.S. at 506, "there will be endless variations in the facts and circumstances" of cases involving voluntary encounters between law enforcement officers and citizens. Each case must be judged by examining the totality of the circumstances. Cases that begin as a traffic stop or an investigatory detention which the officer attempts to transform into a consensual encounter are problematic. See *State v. Hayes*, 35 Kan. App. 2d 616, 626, 133 P.3d 146 (2006); *State v. Moore*, 34 Kan. App. 2d 795, 802, 124 P.3d 1054 (2005), *aff'd* 283 Kan. 344, 154 P.3d 1 (2007). However, this is not that type of case. This case simply involves a police officer approaching a citizen in a public place and asking questions. Such activity by an officer does not constitute a seizure unless there is some display of

authority which signals to the average citizen that he or she must comply with the officer's requests. There was no such display of authority by the officer in this case.

In summary, the encounter between Young and Rousseau was voluntary when viewed objectively under the totality of the circumstances. In fact, if this encounter is not considered voluntary, it is difficult to imagine any situation that would be. Young was never seized, and his Fourth Amendment rights were not implicated. The search of Young's person was lawful based on his voluntary consent. Accordingly, the district court did not err in denying Young's motion to suppress the evidence.

Affirmed.