NOT DESIGNATED FOR PUBLICATION

No. 116,715

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

PABLO CONSTANTINO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Kiowa District Court; E. LEIGH HOOD, judge. Opinion filed June 22, 2018. Reversed and remanded with directions.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Chay T. Howard*, county attorney, *J. Scott James*, former county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., HILL and BUSER, JJ.

STANDRIDGE, J.: Pablo Constantino appeals his convictions for possession of marijuana with intent to distribute, possession with intent to use drug paraphernalia, possession of marijuana with no drug tax stamp, and a traffic infraction under K.S.A. 2017 Supp. 8-1522. Constantino argues the district court erred in denying his motion to suppress evidence. He also argues the district court lacked jurisdiction to convict him of possession of marijuana with no drug tax stamp and of violating K.S.A. 2017 Supp. 8-1522. For the reasons stated below, we are persuaded by each of Constantino's arguments. Therefore, we reverse the decision to deny suppression and reverse

1

Constantino's convictions for possession of marijuana with no drug tax stamp and for violating K.S.A. 2017 Supp. 8-1522.

FACTS

On December 24, 2014, Kiowa County Deputy Sheriff Danny McDorman was observing traffic on U.S. Highway 54, between Greensburg and Haviland, Kansas. Although U.S. Highway 54 is mostly a two-lane highway between Greensburg and Haviland, McDorman's patrol car was located about one-fourth of a mile before the end of a four-lane limited stretch of highway.

A little bit after noon, Deputy McDorman observed Constantino's pickup truck traveling in the left lane of the two lanes proceeding in the same direction, which is a violation of K.S.A. 2017 Supp. 8-1522. McDorman initiated a traffic stop by activating his emergency lights. After both vehicles had pulled over onto the shoulder, McDorman approached the passenger's side window of the truck and asked Constantino for his driver's license and proof of insurance. As Constantino was gathering the requested documentation, McDorman asked him where he was headed. Constantino told him he was going to First Street in Wichita. Observing three roller duffel bags in the back seat, McDorman asked Constantino whether he was moving; Constantino replied he was visiting a friend. While questioning Constantino, McDorman learned that the truck was a rental. As such, McDorman asked Constantino to produce the rental agreement. While Constantino was looking for the rental agreement, McDorman noticed the interior of the rental truck was "extremely messy," with trash on the floor boards, items on the dash board, and blankets piled in the back seat. The exterior of the truck was also "extremely muddy." When McDorman asked Constantino about the mud, Constantino explained that he had gone "mudding" with some friends in Utah.

2

After finding the rental agreement, Constantino gave Deputy McDorman all of the requested documentation. McDorman walked back to his patrol car with the documentation. In reviewing the rental agreement, McDorman noticed that the truck was supposed to be returned the following day, December 25, 2014, at 2 p.m. McDorman also noticed that the contract granted Constantino permission to operate the vehicle only in the State of California and that Constantino appeared to be in violation of the "no pets and no smoking" language in the agreement:  he was traveling with a Chihuahua and had cigarettes in the truck.

After learning that Constantino had a valid license and no warrants or criminal history, Deputy McDorman walked to the passenger side window of the truck and handed the documentation back to Constantino. McDorman gave Constantino a verbal warning for the traffic infraction and told him to drive safely. With his feet in place, McDorman then swayed his body to the left, turned his head for a brief second toward his patrol car, immediately turned his head back around and said:  "While you're here, can I ask you a few more questions?" Constantino agreed. At this point, McDorman propped his arms on the door of the open passenger window, leaned his head partially into the truck, and proceeded to ask Constantino for a second time where he was going; Constantino replied, "Kansas." When McDorman asked him whether he was going to Kansas City, Constantino said he was going to Chicago. McDorman also asked Constantino what he did for a living; Constantino replied that he was a cattle farmer. McDorman later testified that he believed Constantino hesitated before answering each of his questions, which McDorman characterized as "very deceptive."

Deputy McDorman ultimately told Constantino he was a criminal interdiction officer and asked Constantino if he possessed any large amounts of currency or illegal narcotics; Constantino denied possessing any. McDorman then requested permission to search Constantino's vehicle, but Constantino refused. In one way or another, McDorman then proceeded to ask Constantino for permission to search the vehicle eight more times.

3

After the eighth refusal, McDorman detained Constantino based on reasonable suspicion of drug trafficking. McDorman requested Kiowa County Deputy Ryan Davis to bring a drug dog to the location. Deputy Davis arrived 27 minutes later. The drug dog performed a free-air sniff and alerted at the truck. The officers searched Constantino's belongings and discovered approximately 37 pounds of marijuana.

Constantino was charged with possession of marijuana with intent to distribute, possession of drug paraphernalia with intent to use, unlawful distribution of controlled substances using a communication facility, distributing or possessing marijuana without a tax stamp, and driving left of center "in violation of K.S.A. 8-1514." The State later dismissed the charge of distributing or possessing marijuana without a tax stamp.

Before trial, Constantino filed a motion to suppress the evidence, claiming the search was illegal. At a hearing on the matter, Deputy McDorman cited the evidence upon which he relied to support reasonable suspicion for his belief that Constantino was trafficking drugs. McDorman testified that in his training and experience, drug traffickers often use rental vehicles to avoid seizure of their own personal vehicles, and they attempt to blend the rental vehicles in with other traffic using "props." McDorman believed that Constantino had covered the truck with mud and staged the trash, blankets, pillows, and other personal items in the truck for that purpose. McDorman also cited Constantino's inconsistency in explaining his destination (Wichita, Kansas, then Chicago) and the fact that rental truck was due back in California the following day.

After hearing testimony and argument from both sides, the district court denied Constantino's motion to suppress the evidence. The court held that the traffic infraction justified the initial stop, which ended when Deputy McDorman returned Constantino's documentation and told him to drive safely. But the court went on to hold that the dialogue turned into a voluntary encounter when Constantino consented to answer McDorman's questions after the initial detention had ended. According to the district

4

court, it was during this voluntary encounter that McDorman obtained reasonable, articulable suspicion to believe Constantino was transporting illegal drugs. Finally, the district court held that the 27-minute detention while McDorman waited for the drug dog to arrive did not exceed a reasonable length of time given the circumstances of the stop and the resources available to officers in western Kansas.

A jury ultimately convicted Constantino of possession of marijuana with intent to distribute, possession with intent to use drug paraphernalia, and possession of marijuana with no drug tax stamp. The district court convicted Constantino of "operating a vehicle left of the center lane, pursuant to K.S.A. 8-1522 subparagraph (b)." The court sentenced Constantino to 111 months' imprisonment, 36 months' postrelease supervision, and a $25 fine for the traffic infraction.

ANALYSIS

A. *Motion to suppress*

Constantino argues the district court erred in denying his motion to suppress. Specifically, Constantino claims that (1) the initial traffic stop did not become a consensual encounter; (2) even if the initial stop became a consensual encounter, Deputy McDorman lacked reasonable suspicion to detain him to wait for the arrival of a drug dog; and (3) even if McDorman had reasonable suspicion to detain him to wait for the arrival of a drug dog, the lengthy duration of that detention was unreasonable and constituted an unlawful seizure.

Appellate courts bifurcate review of the district court's ruling on a motion to suppress: Factual findings are reviewed to determine whether they are supported by substantial competent evidence, but the ultimate legal conclusion drawn from such facts is a question of law reviewed using a de novo standard. *State v. Thompson*, 284 Kan. 763,

5

772, 166 P.3d 1015 (2007). The State bears the burden of proof to demonstrate that a search or seizure that led to the discovery of the evidence in question was lawful. *State v. Anderson*, 281 Kan. 896, 901, 136 P.3d 406 (2006). The court will not reweigh evidence, determine witnesses' credibility, or resolve conflicts in evidence. *State v. Harris*, 284 Kan. 560, Syl. ¶ 9, 162 P.3d 28 (2007).

The crux of all three arguments presented by Constantino is that he was illegally detained by Deputy McDorman after the reason for the initial traffic no longer existed. But the State characterizes the interaction as a series of legal detentions. The district court agreed, holding that McDorman's initial traffic stop was legal, it became a consensual encounter when Constantino agreed to answer additional questions, and finally became a lawful detainer because the answers to the additional questions asked by McDorman established reasonable suspicion that Constantino was trafficking drugs.

The Fourth Amendment to the United States Constitution guarantees "'[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Anderson*, 281 Kan. at 901. Section 15 of the Kansas Constitution Bill of Rights provides identical protection. 281 Kan. at 901. Under the constitutional standards, an officer may not detain a person without reasonable and articulable suspicion that he or she has committed, is about to commit, or is committing a crime. *State v. Thomas*, 291 Kan. 676, 687, 246 P.3d 678 (2011). In contrast, the Fourth Amendment does not provide protection to voluntary encounters with police. 291 Kan. at 682.

There is no question, nor does Constantino challenge, that Deputy McDorman's initial seizure to effectuate the traffic stop was legal. McDorman observed Constantino remain in the left lane of a passing lane in violation of K.S.A. 2017 Supp. 8-1522. See *State v. Coleman*, 292 Kan. 813, 818, 257 P.3d 320 (2011) ("A traffic violation provides an objectively valid reason for conducting a traffic stop."). During a routine traffic stop,

6

an officer may request a driver's license and vehicle registration, conduct a computer check, and issue a citation. "If no information raising a reasonable and articulable suspicion of illegal activity is found during the time period necessary to perform the computer check and other tasks incident to a traffic stop, the motorist must be allowed to leave without further delay. [Citation omitted.]" *Thompson*, 284 Kan. at 774. Therefore, McDorman's continued detention of Constantino beyond the traffic stop was illegal unless the deputy discovered information raising a reasonable and articulable suspicion of illegal activity while the deputy was performing the tasks incident to a traffic stop or the interaction transformed into a consensual encounter. In this case, McDorman did not discover information raising a reasonable and articulable suspicion of illegal activity while performing the tasks incident to a traffic stop. Thus, the continued detention of Constantino beyond the traffic stop was illegal unless it the interaction transformed into a consensual encounter.

Consensual encounters—when a citizen interacts with police voluntarily and not under coercion—are not considered seizures. See *Thompson*, 284 Kan. 763, Syl. ¶ 4. An interaction is considered a consensual encounter "if under the totality of the circumstances the officer's conduct conveys to a reasonable person that he or she is free to refuse the requests or otherwise end the encounter." 284 Kan. 763, Syl. ¶ 9. On the other hand, if an officer, by means of physical force or show of authority, has retrained the liberty of a citizen, then a seizure has occurred. *Thomas*, 291 Kan. at 683.

The Kansas Supreme Court has recognized several objective factors for courts to use in determining whether a police encounter is voluntary. Factors that may indicate the encounter was consensual include: "knowledge of the right to refuse, a clear communication that the driver is free to terminate the encounter or refuse to answer questions, return of the driver's license and other documents, and a physical disengagement before further questioning." *Thompson*, 284 Kan. at 811. Examples of factors that indicate the encounter was coercive include: "the presence of more than one

7

officer, the display of a weapon, physical contact by the officer, use of a commanding tone of voice, activation of sirens or flashers, a command to halt or approach, and an attempt to control the ability to flee." *State v. McGinnis*, 290 Kan. 547, 553, 233 P.3d 246 (2010). In applying the totality of the circumstances test, the court must carefully analyze the facts of each case. No one factor is considered dispositive. The court is not expected to merely count the number of factors indicating voluntariness versus coercion, but rather weigh each factor in light of the other factors present in the case. See 290 Kan. at 553.

The fact that Deputy McDorman asked Constantino if he would mind answering more questions at the conclusion of the traffic stop does not, on its own, constitute a detention. See *McGinnis*, 290 Kan. at 552 ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."); *Thompson*, 284 Kan. 763, Syl. ¶ 17 ("Law enforcement questioning, by itself, is unlikely to result in a Fourth Amendment violation. Unless the surrounding conditions are so intimidating as to demonstrate that a reasonable person would have believed he or she was not free to disregard the questions, there has been no intrusion upon the detained person's liberty or privacy that would implicate the Fourth Amendment."). Rather, this court must look at the circumstances of the case as a whole to determine whether the questioning initiated a consensual encounter.

Here, the district court held:

"[Deputy McDorman] went back to the vehicle to return Mr. Constantino's documents to him. He then re-approaches the vehicle, hands Mr. Constantino the documents, makes some reference to telling him to have a nice day or drive safe or something along those regards, that it is apparent from the video that approximately one second elapses. It appears to me that Deputy McDorman took kind of a—rocked back on his leg, turned towards his vehicle, does not appear to take any steps toward his vehicle when he immediately turns back and re-engages the Defendant and asked him if he could ask him a few more questions. From what you can hear on the tape, the Defendant does respond

8

and a question-and-answer conversation ensues. I did not hear, nor did Deputy McDorman testify, that at any time during this brief question and answer that this Defendant indicated he didn't want to answer any more questions. He didn't inquire if he could just drive on off. He answered the questions in what appears to me to be in a free and voluntary manner."

The record supports all of the factors cited by the district court. The police dash camera video of the stop confirmed the court's description that Deputy McDorman handed back Constantino's documents, told him to "drive safely," then "rocked back" and "turned towards his vehicle" and "immediately turn[ed] back and re-engage[d]" Constantino by inquiring whether he could ask a few more questions.

Having determined that the district court's factual findings are supported by evidence in the record, we now must decide whether the facts support the district court's legal conclusion that the traffic detention turned into a voluntary consensual encounter at the time Deputy McDorman began asking additional questions. To do so, we consider the objective factors set forth by our Supreme Court to determine whether McDorman's conduct would have conveyed to a reasonable person that he or she was not required to answer questions and was free to end the encounter. Again, this determination is a question of law that we review using a de novo standard. *Thompson*, 284 Kan. 763, Syl. ¶ 9.

*Return of the driver's license and other documents*

There is no dispute that Deputy McDorman returned Constantino's driver's license, his insurance documentation, and his rental agreement.

9

*Clear communication that the driver is free to end the encounter or refuse to answer questions*

Deputy McDorman did not communicate to Costantino that he was free to end the encounter or that he could refuse to answer questions. A law enforcement is not required to inform a person he or she is free to leave or that the person is not required to answer any questions, though the absence of this advice is a factor that may be considered under the totality of the circumstances. *State v. Young*, 37 Kan. App. 2d 700, 715-16, 157 P.3d 644 (2007).

*Physical disengagement*

Constantino argues Deputy McDorman's slight movements were not a clear physical disengagement that would indicate to Constantino that the traffic stop had ended. Constantino acknowledges that there is no bright-line rule requiring disengagement, but disengagement is a factor this court may consider. See *Thompson*, 284 Kan. at 803.

While "the State is not required to prove a physical disengagement between the end of a detention and the beginning of a consensual encounter," this court may consider "the physical movement of a law enforcement officer" as a factor when considering whether a reasonable person would feel free to refuse an officer's request or otherwise terminate the encounter. 284 Kan. at 803. The State contends the officer's actions in *Thompson* were similar to those in this case: The officer checked Thompson's license and returned it, telling Thompson to have a nice day; Thompson thanked him. The officer "turned and took one step away from the vehicle" before he "turned back around to the window and asked casually and in a cordial tone if he could ask Thompson a few more questions." 284 Kan. at 810. The Supreme Court held that on those facts, "[t]here was not a clear statement that the traffic stop had ended, that Thompson had the right to say 'no,' and not a clear physical disengagement." 284 Kan. at 811.

In this case, Deputy McDorman returned Constantino's license and documents, issued a verbal warning regarding the traffic infraction, and told Constantino to "drive safely." Unlike the facts in *Thompson* where the officer turned and took a step away from the vehicle, McDorman only took a quick glance away from Constantino's truck, shifted the weight on his feet without taking any steps toward his police vehicle, and stated, "*While you're still here* can I ask you a few more questions?" (Emphasis added.) We find McDorman's fleeting turn of his head and the shifting of his body weight fail to constitute a clear physical disengagement that would indicate to Constantino that the traffic stop had ended.

*Knowledge of right to refuse*

There is no direct evidence on the issue of whether Constantino knew he was free to end the encounter and refuse to answer additional questions. But the language used by Deputy McDorman to justify asking more questions supports the conclusion that Constantino did not know he was free to end the encounter or refuse to answer additional questions. As noted above, McDorman prefaced his request to ask additional questions by stating, "While you're still here." But the video clearly showed that the remark "[w]hile you're still here" was made within one second after McDorman told Constantino to "drive safely." And Constantino was "still there" because the one second that had elapsed since McDorman told him to drive safely was not enough time to do anything but "still be there" as a result of the traffic stop. Based on this communication, a reasonable person likely would feel that the additional questions were merely a continuation of the initial traffic detention.

*Presence of more than one officer*

Although more than one officer was present during the additional questioning, there is no evidence that Constantino knew this fact.

11

*The display of a weapon*

Deputy McDorman was in uniform and was armed with a weapon.

*Physical contact by the officer*

There is no evidence that Deputy McDorman engaged in any physical contact with Constantino's person.

*Use of a commanding tone of voice*

For the most part, Deputy McDorman used an affable tone of voice when asking Constantino the additional questions. Near the end of the questioning, however, McDorman told Constantino that he was a criminal interdiction officer and asked Constantino if he possessed any large amounts of currency or illegal narcotics. After Constantino said no, McDorman asked to search the vehicle. Constantino refused. In one way or another, McDorman then proceeded to ask Constantino for permission to search the vehicle eight more times. Although the first few times could be chalked up to an attempt to clarify the refusal, the audio from the video reflected McDorman's tone becoming more commanding when Constantino continued to deny the deputy's request to search the vehicle. "[R]epeated questions, which persist despite repeated denials of culpability, can be considered in determining whether an encounter is voluntary." *State v. Hogan*, 45 Kan. App. 2d 715, 723, 252 P.3d 627 (2011).

*Activation of sirens or flashers*

Deputy McDorman displayed his emergency lights for the entire encounter. The *Thompson* court explained that "[c]onsidered as part of the totality of the circumstances, the presence of absence of emergency lights may or may not be significant; emergency lights may signify different meanings under different circumstances." 284 Kan. at 808.

12

Here, McDorman originally activated his emergency lights to initiate the traffic stop, which was a clear signal of a seizure. Like in *Thompson*, the lights remained activated after McDorman returned Constantino's documents, issued a traffic warning, and told Constantino to drive safely, although there was no unequivocal sign that the traffic stop had concluded. See 284 Kan. at 808. But unlike in *Thompson*, the stop here was at noon rather than at night, so it was less likely that the lights remained on for safety purposes. See 284 Kan. at 811-12 ("the dark of night and the end of the traffic stop make the display of lights ambiguous and not a clear show of authority").

*A command to halt or approach*

Deputy McDorman did not command Constantino to stop or to approach.

*An attempt to control the ability to flee*

Right before he told Constantino to drive safely, Deputy McDorman was leaning on Constantino's truck while he communicated with Constantino through the open passenger window. Approximately two to three seconds elapsed between the time when McDorman told Constantino to drive safely and when Constantino agreed to answer a few more questions. As soon as Constantino agreed to answer a few more questions, McDorman immediately propped his arms on the door of the open passenger window and leaned his head partially into the truck. Notably, McDorman had his arms propped on the door of the open passenger window and his head partially in Constantino's truck during the entire time the additional questioning took place.

In sum, Deputy McDorman returned Constantino's driver's license and other documents, Constantino had knowledge of only one officer being present, McDorman did not have physical contact with Constantino, McDorman used an affable tone of voice during most of the questioning, and McDorman did not command Constantino to stop or

13

to approach. On the other hand, McDorman did not tell Constantino he was free to leave, McDorman did not physically disengage from the initial traffic stop, McDorman justified his request to ask additional questions based on Constantino "still being there" less than one second after the deputy told him to drive safely, McDorman was in uniform and was armed with a weapon, McDorman asked Constantino for permission to search the truck nine times, McDorman displayed his emergency lights for the entire encounter, and McDorman had his arms propped on the door of the open passenger window and his head partially in Constantino's truck during the entire encounter. Considering the totality of the circumstances, we necessarily conclude that a reasonable person would not have felt free to refuse the deputy's request to respond to more questions or otherwise terminate the interaction. See *McGinnis*, 290 Kan. at 553. Given our finding that the encounter did not transform into a voluntary encounter, and in the absence of reasonable suspicion to believe that Constantino was engaging in illegal conduct at that point in time, the continued detention of Constantino became illegal at the time the investigation of the traffic infraction was complete. Because the drug dog was called and the marijuana subsequently was found while Constantino was illegally detained, the district court erred in denying the motion to suppress. See *Wong Sun v. United States*, 371 U.S. 471, 484-87, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *Thomas*, 291 Kan. at 689. For this reason, we reverse the decision of the district court denying the motion to suppress and remand with directions for the court to grant the motion.

As a final note on this issue, we find it unnecessary to address whether Deputy McDorman had reasonable suspicion to detain Constantino in order to wait for the arrival of a drug dog or whether the lengthy duration of that detention was so unreasonable that it constituted an unlawful seizure because the initial traffic stop never transformed into a voluntary encounter.

14

B. *Conviction for possession of marijuana without a tax stamp*

Constantino argues that the district court lacked jurisdiction to convict him of possessing marijuana without a tax stamp because that charge was voluntarily dismissed at arraignment. The State concedes this issue. For this reason, we must reverse Constantino's conviction on this charge.

C. *Conviction for traffic infraction under K.S.A. 2017 Supp. 8-1522*

Finally, Constantino argues that the district court lacked jurisdiction to convict him of a traffic infraction pursuant to K.S.A. 2017 Supp. 8-1522. Specifically, Constantino contends that he was charged under K.S.A. 8-1514, and the State never amended the charge. The State concedes that it failed to amend the charge prior to trial. Accordingly, we must reverse Constantino's traffic infraction conviction.

Reversed and remanded with directions.

\* \* \*

BUSER, J., concurring in part and dissenting in part: I dissent because, in my opinion, the district court correctly found the traffic stop detention became a consensual or voluntary encounter when Deputy McDorman returned all of Constantino's documents, advised that he was only giving him a warning regarding the traffic infraction, and counseled him to drive safely, whereupon Constantino voluntarily consented to answering the deputy's additional questions. Under these totality of circumstances, the deputy's conduct conveyed to a reasonable person that he or she was free to refuse the officers' requests or otherwise terminate the encounter. See *State v. Thompson*, 284 Kan. 763, 785, 166 P.3d 1015 (2007). Accordingly, I dissent from the majority's reversal of the district court's denial of Constantino's motion to suppress evidence. I concur, however, in

15

my colleagues' judgment reversing Constantino's convictions for possession of marijuana without a tax stamp and the traffic violation.

As shown by my colleagues' frequent citation to *Thompson*, this opinion is our Supreme Court's landmark exposition relating to traffic stops that evolve into voluntary encounters. In my view, because the *Thompson* opinion is, in relevant part, a mirror image factually with our case on appeal, its analysis and holding—which found that a traffic stop detention had evolved into a voluntary encounter—should be dispositive in this case. Instead, the majority declines to apply the holding in *Thompson* on essentially identical case facts and, without citation to any Kansas case precedent with similar facts in support of the majority's decision, mistakenly concludes there was no voluntary encounter.

Before engaging in a comparison between the totality of circumstances in *Thompson* and the case on appeal, some additional facts are helpful to the analysis. First, the traffic stop in this case lasted about 16 minutes. During that time, Deputy McDorman spoke to Constantino about the traffic violation, obtained his driver's license, registration and car rental agreement, went to his patrol vehicle, and then returned to the rental truck to return the documents, inform Constantino that he was only getting a warning and advise him to drive safely. During this 16 minutes, Constantino walked freely outside the truck, removed one suitcase from the passenger compartment before putting it back, took off his boots, put on his shoes, and then sat in the driver's seat awaiting the deputy's return.

Second, the elapsed time between when Deputy McDorman asked Constantino if he would answer some questions until the deputy ordered him out of the truck to await a drug sniffing dog was about three and a half minutes. The district court found that during this time period the deputy and Constantino were engaged in a voluntary encounter.

16

A comparison of the totality of circumstances in the *Thompson* case with the facts in the present case reveals the voluntary nature of the encounter between Constantino and Deputy McDorman. For ease of reference, I will follow my colleagues' listing of the relevant factors used in their analysis.

*Return of the driver's license and other documents*

In both *Thompson* and in this case, the officer returned the driver's license and all documents to the driver at the end of the traffic stop.

*Physical disengagement*

In both *Thompson* and in this case there was no physical disengagement at the end of the traffic stop and the beginning of the officer's additional questioning.

*Knowledge of the right to refuse*

In *Thompson*, the officer told the driver to have a nice day and took a step towards walking away but returned within a second or two and asked the driver, "'By the way, can I ask you a few questions?'" *Thompson*, 284 at 769. Upon these facts, our Supreme Court concluded: "There was not a clear statement that the traffic stop had ended, that Thompson had the right to say 'no,' and not a clear physical disengagement." *Thompson*, 284 at 811.

These case facts mirror the case on appeal and, as a result, I would conclude, as our Supreme Court did in *Thompson*, that the officer's statements did not inform the driver that he had a right to refuse questioning.

*Presence of more than one officer*

In both *Thompson* and in this case, a backup officer was present during some portion of the encounter, although that officer was not involved in the conversation with the driver. Moreover, as found by the majority in this case, there was not even evidence that Constantino was aware of the backup officer.

*The display of a weapon*

In both *Thompson* and this case, the officer was in uniform and armed with a weapon. There was no evidence in either case that it was ever displayed or shown to the driver. "[T]he mere fact that an officer is in uniform and carrying a weapon does not render the encounter coercive." *State v. Young*, 37 Kan. App. 2d 700, 715, 157 P.3d 644 (2007).

*Physical contact by the officer*

In *Thompson* there was no physical contact with the driver. Similarly, as acknowledged by my colleagues, Deputy McDorman had no physical contact with Constantino.

*Use of a commanding tone of voice*

In *Thompson*, our Supreme Court described the officer as having "'not even an authoritative tone of voice.'" 284 Kan. at 789. In this case, my colleagues find that "[f]or the most part, Deputy McDorman used an affable tone of voice when asking Constantino the additional questions." Slip op. at 12. My colleagues point out, however, that the deputy repeated his request for Constantino to consent to a search of the truck several times. While they acknowledge, the "first few times could be chalked up to an attempt to

clarify the refusal," my colleagues find that the later requests "reflected McDorman's tone becoming more commanding." Slip op. at 12.

My review of the videotape reveals that for the first two and one half minutes of the post-traffic stop encounter, Deputy McDorman and Constantino engaged in a general, free-flowing and friendly conversation. On appeal, Constantino agrees that about two minutes elapsed with "Deputy McDorman quizzing Mr. Constantino about his travel plans, the rental of the truck, and his job."

At the end of this time period, the deputy informed Constantino that he was a criminal interdiction officer and inquired whether he had any drugs or large sums of money. Constantino replied, "No." The final minute of the conversation involved a discussion between the deputy and Constantino regarding whether the driver would consent to a search of the truck. In my view, during this discussion Deputy McDorman did not use a commanding tone of voice but given Constantino's ambiguous responses, the deputy was simply attempting to get a definitive answer to his question. As characterized by Constantino on appeal: "Over the next minute, Deputy McDorman requested permission to search the truck or sought to obtain a clear statement of refusal from Mr. Constantino in seven distinct statements or questions." At the end of this one minute period, Deputy McDorman determined that Constantino did not consent to a search of the truck, and the deputy ordered him out of the vehicle to await the arrival of a drug sniffing dog. Unquestionably, the voluntary encounter ended at that point.

In summary, my colleagues focus on the deputy's "more commanding" tone during the last 60 seconds of the encounter while not considering the rest of the three and a half minute conversation which they admit was "affable" for the most part. Slip op. at 12.

Regardless, the last one minute of the encounter dealt exclusively with whether Constantino would consent to a vehicle search. Constantino's earlier responses to other

19

questions proffered by Deputy McDorman—which the deputy considered in determining that there was "a reasonable and articulable suspicion that the driver [was] engaged in illegal activity," see *Thompson*, 284 Kan. 763, Syl. ¶ 8, occurred in the two and one half minutes prior to this time when the deputy's tone was, according to my colleagues, "affable." Slip op. at 12. Assuming *arguendo* that the voluntary encounter ended two and a half minutes after it began, Constantino's responses during that time period were properly considered in the district court's evaluation of whether there was a reasonable and articulable suspicion to further detain Constantino because of the deputy's belief that the truck contained illegal drugs.

*Activation of sirens or flashers*

In both *Thompson* and this case, the officer's emergency lights were activated during the encounter. My colleagues suggest that because the traffic stop in this case occurred in daylight rather than at night, "it was less likely that the lights remained on for safety purposes." Slip op. at 13. Of course, the district court made no such finding, and the basis for this speculation is unknown. For my part, having viewed the entirety of the videotape and observed considerable traffic, including semi-trailer trucks, traveling at high speeds on Highway 54 within feet of the narrow shoulder where the police vehicle and truck were parked, I would suggest that Deputy McDorman left his emergency lights on for the safety of himself and Constantino.

*An attempt to control the ability to flee*

In both *Thompson* and this case, there was no attempt to control the ability to flee, or as the United States Supreme Court has described this factor, "no blocking of exits." *United States v. Drayton*, 536 U.S. 194, 204, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002) as cited in *Thompson*, 284 Kan. at 789. As noted earlier, *during the traffic detention*, Constantino got in and out of the truck, handled luggage, changed footwear and walked

20

about on the side of the roadway with Deputy McDorman exercising no restraints upon his freedom of movement. Similarly, the deputy made no attempt to control Constantino's ability to flee during the encounter after the traffic detention. For example, the deputy did not ask Constantino to get out of the truck during the encounter so that he could not drive away, or reposition his police vehicle to prevent the truck's forward movement.

The majority, however, construes Deputy McDorman's resting his arms on the door of the open passenger window and occasionally leaning his head into the truck while speaking with Constantino as an attempt to control his ability to flee. Importantly, on appeal, Constantino does not complain or even mention these actions by the deputy as a factor suggesting that the encounter was involuntary. Moreover, the district court made no such adverse finding.

Upon viewing the videotape, I consider the deputy's actions part of the informal nature of the conversation, and also the result of the difficulty the two men had in conversing, given the loud noise caused by high speed traffic traveling on Highway 54. Moreover, although not mentioned by the majority, the record shows that Constantino suffered from hearing loss, which explains why the communication between the two men in this noisy environment was somewhat difficult, and necessitated the deputy occasionally leaning in the open window in order to talk with Constantino.

*Conclusion*

In summary consideration of all the factors relevant to this issue, the Supreme Court in *Thompson*, presented with both favorable and unfavorable facts almost identical to the case on appeal concluded:

> "[T]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no threat, no command, not even an authoritative

21

tone of voice. Officer Weinbrenner did nothing to 'convey a message that compliance with [his] requests [was] required.' *Florida v. Bostick*, 501 U.S. 429, 435, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991). No factor would indicate that Thompson's will was 'overborne and his capacity for self-determination critically impaired.' See *Bustamonte*, 412 U.S. at 225, 93 S. Ct. 2041. Nothing about the encounter indicated duress or coercion. We conclude that under the totality of the circumstances a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter.

"The trial court correctly determined the detention was consensual." *Thompson*, 284 Kan. at 812.

Thompson is dispositive of the voluntary encounter issue. At a minimum, my colleagues should have held that the two and one half minutes of questioning by Deputy McDorman was a voluntary or consensual encounter with Constantino. Then, our court should have considered the next issue on appeal—whether information raising a reasonable and articulable suspicion of illegal activity was discovered by Deputy McDorman during both the traffic stop and the voluntary encounter in order to justify the continued investigative detention.