No. 119,212

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LUIS SAUL GONZALEZ,
*Appellant*.

SYLLABUS BY THE COURT

1.

A routine traffic stop is a seizure under the Fourth Amendment to the United States Constitution.

2.

Traffic stops cannot be measurably extended beyond the time necessary to process the infraction that prompted the stop unless there is a reasonable suspicion of or probable cause to believe there is other criminal activity, or consent.

3.

The analysis of the voluntariness of an encounter must encompass the totality of the circumstances. In that totality of the circumstances context, the test is whether a reasonable person would feel free to disregard the officer's questions, decline the officer's requests, or otherwise terminate the encounter, but the person nevertheless chooses to voluntarily submit to a prolonged encounter.

Appeal from Coffey District Court; PHILLIP M FROMME, judge. Opinion filed November 27, 2019. Reversed and remanded.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Wade H. Bowie II*, county attorney, *Christopher Phelan*, former county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., PIERRON and STANDRIDGE, JJ.

STANDRIDGE, J.: Following a traffic stop, Luis Saul Gonzalez was charged with possession with intent to distribute more than 30 kilograms of marijuana and possession of drug paraphernalia with intent to distribute. Gonzalez pled not guilty and filed a motion to suppress on grounds that the search and seizure of his vehicle was unlawful. That motion was denied. After a bench trial, the district court found Gonzalez guilty on both counts and sentenced him to 114 months in prison. Gonzalez appeals, claiming the district court erred by denying his motion to suppress.

FACTS

We note, as a preliminary matter, that the record on appeal includes a dash cam video of the entire traffic stop at issue in this case. This video was introduced into evidence by the State at the suppression hearing.

On February 11, 2017, Kansas Highway Patrol Trooper Benjamin Marten was in his patrol vehicle monitoring traffic on Interstate 35 in Coffey County, Kansas. Interstate 35 is a four-lane highway divided by a grass median. The patrol vehicle was parked in the median, and Trooper Marten was monitoring, both by sight and by radar, the speed of each vehicle as it passed. Around 5 p.m., Trooper Marten observed a black Cadillac Escalade pickup truck with California tags pass by his parked patrol vehicle. The

2

Escalade was in the right-hand lane for slower traffic, but Trooper Marten believed the truck was traveling over the posted speed limit, which was 75 miles per hour on that stretch of Interstate 35. He confirmed his belief by measuring the speed by radar, which reflected that the Escalade was traveling at 78 miles per hour. As the Escalade drove by, Trooper Marten noticed the driver was wearing large sunglasses and had a goatee. But the trooper could only see half of the driver's face because it was partially obscured by the "B pillar," or midline, of the vehicle. Trooper Marten later testified that he became suspicious of the driver because: (1) both of the driver's hands were on the steering wheel, (2) the driver was looking straight ahead, and (3) the driver did not wave at or otherwise acknowledge Trooper Marten when driving by the stationary patrol car.

After allowing the Escalade to pass him, Trooper Marten pulled out of the median and began tailing the Escalade. As he did so, Trooper Marten ran the Escalade's license plate number through the Kansas Highway Patrol dispatch system and learned that the registered owner of the Escalade was a driver named Luis Saul Gonzalez. After learning the name of the registered owner, Trooper Marten checked the Escalade's speed one more time, confirmed that it was still traveling at 78 miles per hour in a 75 mile-per-hour zone, and initiated a traffic stop by activating his emergency lights.

Almost immediately after Trooper Marten activated the emergency lights, Gonzalez pulled over and stopped the Escalade on the right-hand shoulder of the roadway. Trooper Marten pulled in behind the Escalade and deactivated the front-facing emergency lights. Trooper Marten approached the Escalade on the passenger side and spoke to Gonzalez through the front passenger window. Trooper Marten explained to Gonzalez that the reason for the stop was driving over the posted speed limit but that Gonzalez would receive only a warning, not a ticket. Trooper Marten then asked Gonzalez for his driver's license and proof of insurance. Gonzalez handed Trooper Marten an expired driver's license with a valid renewal paper, which confirmed his identity as Luis Saul Gonzalez and that he was the registered owner of the Escalade.

Gonzalez also handed Trooper Marten a proof of insurance card, but it was expired. While Gonzalez was looking for a current proof of insurance card, Trooper Marten asked him some questions about his travel plans. Gonzalez told Trooper Marten that he was from Riverbank, California, and was on his way to visit family in Kansas City, Kansas. As this exchange was taking place, Trooper Marten said he noticed that Gonzalez' hands were shaking, that there was a large suitcase in the back seat, and that there was some trash and food wrappers scattered around the passenger compartment.

Gonzalez was unable to find a current proof of insurance card so Trooper Marten went back to his patrol vehicle and ran Gonzalez' information to check if there was valid insurance on file with the vehicle's registration. Through this process, Trooper Marten confirmed Gonzalez had valid insurance on file with the state of California. But before he left his patrol vehicle to return to the Escalade, Trooper Marten explored the various travel routes between Riverbank, California, and Kansas City, Kansas, and discovered that Interstate 35, through Coffey County, was not a suggested route. Through a computer message, Trooper Marten asked Trooper Littrell, who was in the area, to come to the location of the stop because Trooper Marten intended to search the Escalade.

Trooper Marten then went back to the Escalade, returned Gonzalez' documents to him, and issued him a verbal warning for excessive speed and failure to provide proof of insurance. By that time, however, Gonzalez found his current card proving he had insurance, so Trooper Marten amended his warning to just the speeding. Trooper Marten explained the meaning of a warning and told Gonzalez to "have a safe trip."

After telling Gonzalez to have a safe trip, Trooper Marten turned his body, took two steps toward his patrol vehicle, turned back around, and, through the Escalade's still open passenger window, asked Gonzalez if he would answer a few more questions. This maneuver is known as the "Kansas Two Step" and is taught to all Kansas Highway Patrol

4

officers as a way to break off an initial traffic detention and attempt to reengage the driver in what would then be a consensual encounter.

While Trooper Marten was executing the "Kansas Two Step," Gonzalez placed his Escalade in drive and started to pull away. But when he heard Trooper Marten call out, Gonzalez put the vehicle back in park, which happened at the same time that Trooper Marten placed his hands on the vehicle through the open window. After Trooper Marten placed his hands on the vehicle, Gonzalez agreed to answer a few more questions. During this second round of questioning, Trooper Marten again asked Gonzalez about his travel plans and specifically asked him why he chose to take Interstate 35 to Kansas City. Gonzalez explained that he had been visiting a friend but gave a few different answers as to where that friend lived. Eventually, Trooper Marten asked for and was given consent to search the Escalade.

Trooper Marten had Gonzalez step out of the truck and, after patting him down for weapons, directed him to stand in the ditch away from the truck. Trooper Marten then returned to his patrol vehicle to get gloves. At about this time, Trooper Littrell, arrived at the scene and parked his patrol vehicle behind Trooper Marten's. Together, the two troopers returned to the Escalade and began their search by opening the unlocked tailgate on the bed portion of the truck. Earlier, Trooper Marten had noticed two handprints on the tailgate as if it recently had been closed. When they opened the tailgate, the troopers found eight duffle bags containing what they suspected was bulk marijuana. Gonzalez immediately was placed under arrest. Gonzalez later told the troopers that a stranger at a truck stop in California offered him $7,000 to drive the bags to the Legends Shopping Center parking lot in Kansas City, Kansas. Gonzalez later stipulated that the troopers found approximately 183 pounds of marijuana in the duffle bags.

Based on the results of the search, Gonzalez was charged with one count of possession with intent to distribute more than 30 kilograms of marijuana and one count of

5

possession of drug paraphernalia with intent to distribute. Gonzalez pled not guilty to both counts and filed two motions to suppress: (1) Gonzalez claimed Trooper Marten unlawfully extended the initial detention and/or unlawfully reinitiated a detention, this time for suspicion of drug activity instead of speeding, without reasonable suspicion to do so and (2) Gonzalez claimed he unlawfully was stopped on the basis of his race and other bias-based policing.

After an evidentiary hearing, the district court denied both motions and the case proceeded to trial. Gonzalez waived his right to a jury trial, and the court found him guilty on both counts. Before sentencing, Gonzalez filed motions for dispositional and durational departures. The court granted a slight durational departure by sentencing Gonzalez to 114 months in prison with a postrelease supervision period of 36 months.

ANALYSIS

On appeal, Gonzalez claims the district court erred in denying both of his motions to suppress. First, he argues the district court erred in finding that his continued detention after the conclusion of the traffic stop was a consensual encounter instead of an involuntary detention without reasonable suspicion to justify it. Second, he argues Trooper Marten unlawfully used national origin as the basis to justify the traffic stop.

Gonzalez argues that Trooper Marten's interaction with him after returning his documents and telling him to have a safe trip was not a consensual encounter but instead was a continued detention, which violated his rights under the Fourth Amendment to the United States Constitution as well as section 15 of the Kansas Constitution Bill of Rights. The standard of review for a district court's decision on a motion to suppress has two parts. First, appellate courts review the district court's factual findings to determine whether they are supported by substantial competent evidence. The ultimate legal conclusions are then reviewed using a de novo standard. In reviewing the factual

6

findings, appellate courts do not reweigh the evidence or assess the credibility of witnesses. When the material facts supporting the district court's decision on a motion to suppress are not in dispute, the ultimate question of whether to suppress is a question of law over which an appellate court exercises unlimited review. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

The Fourth Amendment of the United States Constitution and section 15 of the Kansas Constitution Bill of Rights prohibit unreasonable searches and seizures. *State v. Ramirez*, 278 Kan. 402, 404, 100 P.3d 94 (2004). A routine traffic stop is a seizure under the Fourth Amendment, so it is subject to the constitutional requirement of reasonableness. *State v. Smith*, 286 Kan. 402, 406, 184 P.3d 890 (2008). To satisfy the reasonableness requirement, the scope and duration of a traffic stop and the circumstances that rendered its initiation must be strictly tied. *State v. Thompson*, 284 Kan. 763, 774, 166 P.3d 1015 (2007); see also *United States v. Sharpe*, 470 U.S. 675, 682, 686-87, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (traffic stops must be minimally intrusive and diligently pursued and law enforcement officer's actions must be reasonably related in scope to circumstances that justified initial interference). During a routine traffic stop, an officer may: (1) request the motorist's driver's license and vehicle registration, (2) conduct a computer check, (3) issue a citation, and (4) take steps reasonably necessary to protect the officer's safety. The stop can last only as long as necessary to complete those tasks, and the tasks must be diligently pursued. *Thompson*, 284 Kan. at 774.

After the tasks related to the purpose for the stop have been completed, the driver must be allowed to proceed without being subject to further delay for additional questioning. To justify a temporary detention for further questioning or investigation, the officer must have reasonable and articulable suspicion of illegal transactions in drugs or another serious crime. *State v. Anderson*, 281 Kan. 896, 902, 136 P.3d 406 (2006). Reasonable suspicion requires something more than just a hunch; law enforcement must

7

be able to state a particularized and objective basis for believing the person stopped is engaged in criminal activity. *State v. DeMarco*, 263 Kan. 727, 734-35, 952 P.2d 1276 (1998). Without reasonable suspicion to justify the extension of a completed stop, any further delay is unreasonable. See *Rodriguez v. United States*, 575 U.S. __, 135 S. Ct. 1609, 1615, 191 L. Ed. 2d 492 (2015) ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he [or she] may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.").

There is no dispute here that the initial traffic stop was lawful: Trooper Marten had the authority to stop the truck and detain the driver based on a speeding violation. But Trooper Marten's continued detention of Gonzalez beyond the traffic stop was illegal unless the trooper discovered information raising a reasonable and articulable suspicion of illegal activity while performing the tasks incident to the traffic stop. The record in this case reflects that Trooper Marten did not discover information raising a reasonable and articulable suspicion of illegal activity while performing the tasks incident to a traffic stop. Therefore, a continued detention of Gonzalez after the conclusion of the traffic stop was illegal unless the interaction transformed into a consensual encounter.

Consensual encounters, when a citizen interacts with police voluntarily and not under coercion, are not considered seizures. See *Thompson*, 284 Kan. 763, Syl. ¶ 4. An interaction is considered a consensual encounter "if under the totality of the circumstances the officer's conduct conveys to a reasonable person that he or she is free to refuse the requests or otherwise end the encounter." 284 Kan. 763, Syl. ¶ 9. On the other hand, if an officer, by means of physical force or show of authority, has restrained the liberty of a citizen, then a seizure has occurred. *State v. Thomas*, 291 Kan. 676, 683, 246 P.3d 678 (2011).

The Kansas Supreme Court has recognized several objective factors for courts to use in determining whether a police encounter is voluntary. Factors that may indicate the encounter was consensual include: "knowledge of the right to refuse, a clear communication that the driver is free to terminate the encounter or refuse to answer questions, return of the driver's license and other documents, and a physical disengagement before further questioning." *Thompson*, 284 Kan. at 811. Examples of factors that indicate the encounter was coercive include: "the presence of more than one officer, the display of a weapon, physical contact by the officer, use of a commanding tone of voice, activation of sirens or flashers, a command to halt or to approach, and an attempt to control the ability to flee." *State v. McGinnis*, 290 Kan. 547, 553, 233 P.3d 246 (2010). In applying the totality of the circumstances test, an appellate court must carefully analyze the facts of each case and no one factor is considered dispositive. Further, appellate courts are not expected to merely count the number of factors indicating voluntariness versus coercion, but rather must weigh each factor in light of the other factors present in the case. See 290 Kan. at 553.

In support of its decision to deny Gonzalez' motion to suppress, the district court held the initial traffic detention terminated when Trooper Marten told Gonzalez to have a safe trip, turned his body, and took two steps towards his patrol vehicle. The district court held the interaction turned into a consensual encounter when Trooper Marten turned back around and asked Gonzalez if he would answer a few more questions. Applying the totality of the circumstances test set forth in *McGinnis*, however, we conclude that a reasonable person would not have felt free to leave when Trooper Marten reinitiated contact by turning back around, leaning into the window while placing his hands on the window opening, and asking Gonzalez if he would answer a few more questions.

1. *Consensual indicators*

      a. *Knowledge of right to refuse to answer questions and leave*

This factor requires us to determine whether Gonzalez knew he had the right to refuse to answer questions and leave without further incident. It appears Gonzalez knew he had the right to leave after Trooper Marten (1) told Gonzalez to have a safe trip, (2) turned his body, and (3) took two steps towards his patrol vehicle. This is evidenced by the fact that Gonzalez already had put the Escalade in drive and begun to move forward. But the issue we must resolve is whether Gonzalez knew he could refuse to answer questions and leave without further incident after Trooper Marten turned around and asked Gonzalez if he would answer a few more questions. Based on the particular facts presented here, we find reasonable persons would not have known they could refuse to answer questions and leave the scene. Specifically, the dash cam video reflects that Trooper Marten was leaning into the Escalade with his hands on the open passenger window of the Escalade at the same time he was asking if Gonzalez would be willing to answer more questions. Had Gonzalez continued to proceed forward and leave the scene instead of putting his foot on the brake and placing his vehicle in park, Gonzalez easily could have concluded that leaving the scene would physically injure Trooper Marten.

      b. *Clear communication of right to refuse to answer questions and leave*

After reinitiating contact with Gonzalez, Trooper Marten did not expressly communicate to Gonzalez that he was free leave or that he could choose not to answer further questions. A law enforcement officer is not required to inform a person that he or she is free to leave or that the person is not required to answer any questions. But the absence of this advice is a factor that may be considered under the totality of the circumstances. *State v. Young*, 37 Kan. App. 2d 700, 715-16, 157 P.3d 644 (2007).

c. *Return of driver's license and other documents*

The record indicates that Trooper Marten returned Gonzalez' driver's license and other documents.

d. *Physical disengagement*

With regard to this factor, Gonzalez argues Trooper Marten's execution of the "Kansas Two Step" was not a clear physical disengagement that would indicate to Gonzalez that the traffic stop had ended. Although the State is not required to prove a physical disengagement between the end of a detention and the beginning of a consensual encounter, we may consider the officer's physical movement as a factor when considering whether a reasonable person would feel free to refuse an officer's request or otherwise terminate the encounter. *Thompson*, 284 Kan. at 803. Notably, the officer's actions in *Thompson* were similar to those in this case: The officer checked Thompson's license and returned it, told Thompson to have a nice day, after which Thompson thanked the officer. The officer then "turned and took one step away from the vehicle" before he "turned back around to the window and asked casually and in a cordial tone if he could ask Thompson a few more questions." 284 Kan. at 810. The Kansas Supreme Court determined these facts failed to establish "a clear physical disengagement." 284 Kan. at 811. Notwithstanding its determination on this particular factor, the *Thompson* court ultimately held that, when considering all of the factors together, the encounter in that case was voluntary and consensual. 284 Kan. at 812.

Here, Trooper Marten returned Gonzalez' driver's license and other documents, issued him a warning for speeding, and told Gonzalez to have a safe trip. Trooper Marten then took two steps back toward his patrol vehicle, made an about face, and reinitiated contact with Gonzalez by placing his hands in the open passenger window and speaking

11

to him through the opening. Relying on *Thompson*, we similarly find these facts fail to establish "a clear physical disengagement."

2. *Coercive indicators*

    a. *Presence of more than one officer*

Trooper Littrell arrived on the scene while Trooper Marten was questioning Gonzalez for a second time, but the record contains no evidence to establish that Gonzalez was aware of Trooper Littrell's presence until after the search of the vehicle began.

    b. *Display of a weapon*

While Trooper Marten did not draw his weapon or otherwise use it to get Gonzalez to consent to answering more questions, he was in uniform and armed at the time he made the request.

    c. *Physical contact by the officer*

There is no evidence to suggest that Trooper Marten engaged in any type of physical contact with Gonzalez' person. Nevertheless, the record reflects that Trooper Marten was leaning into the Escalade with his hands physically placed on the open passenger window of the Escalade at the same time he was asking if Gonzalez would be willing to answer more questions.

    d. *Use of commanding tone of voice*

Gonzalez argues that Trooper Marten asked unrelated and accusatory questions during the course of the traffic stop. Doing so, Gonzalez claims, placed him under duress,

conveyed to him that he was being investigated for criminal activity, and made it so that he did not feel free to refuse Trooper Marten's request to ask additional questions. But the video from the dashboard camera shows that Trooper Marten kept a light and friendly tone throughout his interaction with Gonzalez. And while he did ask some unrelated questions about Gonzalez' travel plans, he did so while Gonzalez was looking for a valid proof of insurance. The questions were not badgering, repetitive, or accusatory. See *State v. Hogan*, 45 Kan. App. 2d 715, Syl. ¶ 6, 252 P.3d 627 (2011) ("Repeated questions by law enforcement officers, persisting despite repeated denials of culpability, may be considered in determining whether an encounter is voluntary.").

### e. *Activation of sirens or flashers*

Trooper Marten activated his emergency lights to initiate the traffic stop but deactivated the front facing emergency lights before he got out of his patrol vehicle to make contact with Gonzalez.

### f. *A command to halt or approach*

There is no evidence to suggest that Trooper Marten verbally commanded Gonzalez to halt or approach. Again, however, the fact that Trooper Marten was leaning into the Escalade with his hands physically placed on the open passenger window of the Escalade reasonably could be construed as a physical command to halt.

### g. *An attempt to control the ability to flee*

Trooper Marten made no attempt to control Gonzalez' ability to leave the scene when he told him to have a safe trip. But Trooper Marten's act of leaning into the Escalade with his hands physically placed on the open passenger window of the Escalade reasonably could be construed as an attempt to control Gonzalez' ability to leave the scene.

13

Based on the totality of the circumstances set forth above, we conclude a reasonable person would not have felt free to refuse the request for additional information or otherwise end the encounter after Trooper Marten turned around and asked Gonzalez if he would answer a few more questions. Accordingly, the district court erred in finding that Gonzalez' continued detention after the conclusion of the traffic stop was a consensual encounter. And in the absence of reasonable suspicion to believe that Gonzalez was engaged in any drug or other criminal activity, we find no legal justification for detaining Gonzalez after the conclusion of the traffic stop. Without legal justification, we necessarily conclude the evidence seized as a result of the illegal detention in this case must be suppressed and we reverse the district court's decision to the contrary. Because we find it proper to suppress the evidence based on the lack of legal justification for detaining Gonzalez after the traffic stop ended, we find it unnecessary to address Gonzalez' alternative claim that suppression is required because Trooper Marten unlawfully used national origin as the basis to justify the traffic stop.

Reversed and remanded.